**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

Petition of McCarthey Investments, LLC,  :
    Petitioner,  :           Index No. 07cv5617
  :

For an Order Pursuant to the Federal  :
Arbitration Act, 9 USC §1, et. seq.  :
Confirming an Arbitration Award,  :
  :

      -against-  :
  :

Abbas A.Shah, Linuxor Asset Management,  :
LLC and Linuxor Capital Management, LLC,  :
    Respondents.  :

-------------------------------------------------------------x
-------------------------------------------------------------x

Petition of 2001 Jane F. McCarthey GRAT No. 5,  :
    Petitioner,  :           Index No. 07cv5618
  :

For an Order Pursuant to the Federal  :    **MEMORANDUM OF LAW IN**
Arbitration Act, 9 USC §1, et. seq.  :    **OPPOSITION TO PETITION TO**
Confirming an Arbitration Award,  :    **<u>CONFIRM ARBITRATION AWARDS</u>**
  :

      -against-  :
  :

Abbas A.Shah, Linuxor Asset Management,  :
LLC and Linuxor Capital Management, LLC,  :
    Respondents.  :

-------------------------------------------------------------x
-------------------------------------------------------------x

Petition of JFM Holdings L.P.,  :
    Petitioner,  :           Index No. 07cv5619
  :

For an Order Pursuant to the Federal  :
Arbitration Act, 9 USC §1, et. seq.  :
Confirming an Arbitration Award,  :
  :

      -against-  :
  :

Abbas A.Shah, Linuxor Asset Management,  :
LLC and Linuxor Capital Management, LLC,  :
    Respondents.  :

-------------------------------------------------------------x

# TABLE OF CONTENTS

**Page**

Preliminary Statement...........................................................................2
Background..........................................................................................2
Argument.............................................................................................6

    I.      This Court Lacks Subject Matter Jurisdiction.............................6
    II.     The Arbitration Award Violates Public Policy.............................7
         A.  The Arbitration Panel and NFA Were Biased, Partial and Corrupt..8
              1.  The Panel............................................................8
              2.  The Process.........................................................9
              3.  The NFA Audit Supervisor....................................10
         B.  The Case Was Filed Outside the Statute of Limitations...........11
         C.  The Panel Demonstrated a Manifest Disregard of the Law...........12
              1.  The Statutes of Limitations Were Clear and Explicitly Applicable to the Matter.......................................12
              2.  The Law Was Improperly Applied by the Panel.............13
              3.  The Panel Knew of the Existence of the Statutes of Limitations........................................................21
         D.  There Was No Fraud.................................................21
              1.  Number of Other Investors and Amount Invested in Fund...21
              2.  15% Stop-Loss Policy.............................................23
              3.  Risk Management..................................................24
              4.  Periodic Account Statements....................................27
              5.  April 2002...........................................................29
              6.  August 25, 2003 Email...........................................30
              7.  Weekly emails.....................................................32
              8.  January 30, 2004 Email..........................................32
              9.  May 2004 Oral Statement of Account Value..................33
              10. No Causation.......................................................33
             11. No Intent to Defraud.............................................11
              12. Not in Connection with a Purchase or Sale...................35
              13. Punitive Damages................................................36
         E.  There Was No Breach of Contract....................................36
         F.  Breach of Fiduciary Duty.............................................41
         G.  Issues Regarding Accounting and Expenses............................42
Conclusion.........................................................................................44

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### CASES

*Anixter v. Home Stake Prod. Co.*, 977 F.2d 1549 (10th Cir. 1992)..........................17

*Benfield v. Mocatta Metals Corp.*, 26 F.3d 19 (2nd Cir. 1994)............................19

*Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2nd Cir. 1952)........................35

*Black v. Riker Maxson Corporation*, 401 F. Supp. 693 (S.D.N.Y. 1975)............*passim*

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)...........................35

*Careau & Co. v. Security Pac. Bus. Credit, Inc.*, 272 Cal.Rptr. 387 (1990)..............39

*Carr v. Cigna Securities, Inc.*, 95 F.3d 544 (7th Cir. 1996)...............................24

*Coastal Caisson Corp. v. E.E. Cruz, et al*, Slip Copy,
        2007 WL 2285936 (S.D.N.Y.)............................................6

*Colnaghi, U.S.A., Ltd. v. Jewelers Protection Services, Ltd.*, 81 N.Y.2d 821,
        611 N.E.2d 282 (1993)...................................................38

*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95 (2d Cir. 2006)..........................12

*Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*,
        502 N.E.2d 1003 (1986)..............................................23, 25

*Dodds v. Cigna Secs., Inc.*, 12 F.3d 346 (2nd Cir. 1993)....................................14

*Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*,
        333 F.3d 383 (2d Cir. 2003)............................................12

*Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238
        (7th Cir. 1991)..........................................................19

*Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22 (2d Cir. 2000)..........................6

*Hall v. EarthLink Network, Inc.*, 396 F.3d 500 (2nd Cir. 2005)............................39

*Kearney v. Prudential-Bache Securities Inc.*, 701 F. Supp. 416 (S.D.N.Y. 1988).........35

*Kennedy v. Josephthal & Co.*, 814 F.2d 798 (1st Cir.1987)................................14

*Klein v. Bower*, 421 F.2d 338 (2nd Cir. 1970)..............................................14

*Lampf v. Gilbertson*, 501 U.S. 350 (1991)......................................................18

*Lanzi v. Brooks*, 54 A.D.2d 1057, 388 N.Y.S.2d 946 (3rd Dept. 1976)..................23, 25

*Laub v. Faessel*, 981 F. Supp. 870 (S.D.N.Y. 1997)........................................34

*Lowe v. Salomon Smith Barney, Inc.*, 206 F.Supp.2d 442 (W.D.N.Y. 2002)..............35

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983)..................6

*New York University v. Continental Ins. Co.*, 87 N.Y.2d 308 (1995).......................36

*O'Leary v. Fanghella,* N.D.Ill. 1994, 866 F.Supp. 1119..........................................7

*Perpetual Sec., Inc. v. Tang,* 290 F.3d 132 (2d Cir. 2002)....................................6

*Phillips v. Levie*, 593 F.2d 459 (2nd Cir. 1979)...............................................14

*Pilarczyk v. Morrison Knudsen Corp.*, 965 F. Supp. 311 (N.D.N.Y. 1997),
      *aff'd*, 162 F.3d 1148 (2nd Cir. 1998)..................................16

*Port Chester Electrical Constr. Corp. v. Atlas*, 40 N.Y.2d 652 (1976).....................38

*Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 614 (1994)....................36

*Rotter v. Leahy*, 93 F.Supp.2d 487 (S.D.N.Y. 2000).........................................19

*Royal Air Properties, Inc. v. Smith*, 312 F.2d 210 (9th Cir. 1962)............................29

*Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402 (S.D.N.Y. 1996)......................16

*Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124 (2d Cir. 1994).......................23, 25

*Sterlin v. Biomune Systems, Inc.*, 154 F.3d 1191 (10th Cir. 1998).........................14

*Tregenza v. Great Amer. Comm. Co.*, 12 F.3d 717 (7th Cir. 1993).........................19

*W.R. Grace & Co. v. Local 759, Int'l Union of the
      United Rubber Workers*, 461 U.S. 757 (1983).......................7

*Walker v. Sheldon*, 10 N.Y.2d 401 (1961)....................................................36

# FEDERAL STATUTES

### *Commodity Exchange Act*

7 U.S.C. § 6(o)…………………………………………………………………...19

7 U.S.C. § 25(c)…………………………………………………………………19

### *Sarbanes-Oxley Act of 2002*

28 U.S.C. § 1658…………………………………………………………………18

### *Securities Exchange Act*

15 U.S.C. § 78(j)(b)……………………………………………………………...18

### *Federal Rules of Civil Procedure*

*Fed. R. Civ. Pro. Rule 8(a)(1)*………………………………………… …………………6

# NFA RULES

National Futures Association Code of Arbitration Rule ¶ 6035…………………12, 13, 17

# UTAH STATE STATUTES

### *Utah Uniform Securities Act*

Utah Code Ann. §§ 61-1-1……………………………………………………...19, 35

Utah Code Ann. §§ 61-1-22(1), (3), and (7)(a)……………………………………19, 20

Respondents ABBAS A. SHAH ("Shah"), LINUXOR ASSET MANAGEMENT, LLC ("LAM") and LINUXOR CAPITAL MANAGEMENT, LLC ("LCM" and collectively with LAM and Shah, "Respondents"), by their attorneys, Shiboleth, Yisraeli, Roberts & Zisman, LLP, submit this Memorandum in Opposition to Petition to Confirm Arbitration Awards (the "Awards") of MCCARTHEY INVESTMENTS, LLC ("MI"), 2001 JANE F. MCCARTHEY GRAT NO. 5 ("McCarthey GRAT"), and JFM HOLDINGS L.P. ("JFM" and collectively with MI and McCarthey GRAT, "Petitioners") and respectfully allege:

## Preliminary Statement

The arbitration award at issue in this case qualifies as the exceptional case, tainted with the improprieties and biases of every arbitration panel member, in which the arbitration award by the infected panel itself is wrought with injustice and should not be confirmed. But this Court does not have jurisdiction over the subject matter, and therefore it may not adjudicate these issues.

## Background

If the panel could have stepped back from its predetermined judgments, the larger view of the Petitioners' claims reveal that Petitioners' losses were caused by honest trading in highly volatile markets, not by either fraud or breach of contract. The broad conclusions that can properly be drawn from the mostly undisputed evidence are that (1) Phillip McCarthey ("McCarthey") was a sophisticated investor who knew that he was making a risky investment (he testified in the arbitration that he knew it was the riskiest 5% of his portfolio, and the offering materials are laden with warnings); (2) McCarthey invested the money essentially as a bet, putting money into a new fund, the Linuxor Global Macro Fund, L.P. (the "Fund"), with no track record (as stated in the offering material), and without checking on the previous track record of

2

the fund manager (no one asked for the previous InterPacific fund performance records until Phillip Egger ("Egger") requested them in the August 15, 2002 e-mail and letter) and without asking for further information or any representations.[1]

After the money was invested: (1) the fund lost over $6,000,000 by mid-August 2002 ($6.5 million by the end of August) due to a sudden drop in the Nikkei and related moves in JGB's, on which the fund had invested heavily in the opposite direction;  (2) Shah indisputably informed Egger, McCarthey's lawyer and college friend, of very substantial losses no later than August 14, 2002 and Egger sent the August 15, 2002 e-mail and letter to Shah and cc'd it to McCarthey.[2] Mr. Egger said that he discussed the subject of the e-mail with McCarthey, but did not remember the contents of the discussion. (Egger Dep., pg. 25.)  Note that, even if McCarthey really did not know of the substantial losses, as he claims now, the fact that Shah disclosed them to Egger and that Egger tried to send the e-mail to McCarthey (as Shah thought he had done) demonstrates that Shah was not trying to conceal the substantial losses and thus did not have any intent to mislead.

Shah did not send a quarterly statement to McCarthey or Egger when it was due on July 31, 2002. Similarly, Shah did not send quarterly statements that were due for the quarters ending September 30, 2002, December 31, 2002, March 31, 2003 or June 30, 2003.[3]  Although

---

[1] The April 19, 2002 internal statement concerning performance of the futures account on the initial 1.5 million investment was not sent to McCarthey and he testified that he did not receive or rely upon anything other than the offering materials prior to investing the additional $10,000,000 in May 2002.  (McCarthey Dep., pg. 32)

[2] McCarthey now denies that Egger had anything to do with his investment, but Egger certainly thought he did at the time he sent the e-mail, which purported to apply to McCarthey's investment as well as Egger's own, and Egger is still involved as late as January 2004 (Resp. Ex. F, Bates No. 00343) and June 2004 (Resp. Ex. H-1). Additionally, Egger handled the initial transfer of McCarthey's money to the Fund, and reviewed the due diligence performed on the Fund by a third party.

[3] Shah testified that at the end of September 2002 he did send the first statement from Citco, covering the period from the inception to August 31, 2002 (it was neither a monthly nor a quarterly statement), but McCarthey claims he did not receive it and Shah cannot prove that he sent it.  (Respondents were unable to locate this statement with a contemporaneous printing footer.)  Since Shah had indisputably just informed Egger of the substantial losses, and Shah thought Egger had informed McCarthey, Shah had no reason not to send the statement to McCarthey.

McCarthey testified that he requested statements from Shah several times orally (McCarthey
Dep., pg. 34), he never sent a written communication or an e-mail requesting financial
information or statements, until Brashear's request for an informal statement in January 2004.
(Resp. Ex. F, Bates No. 00345). McCarthey testified that he expected monthly or quarterly
statements just like a brokerage account or mutual fund, that he asked for them repeatedly, but he
never got them and he never followed up in writing.

Where was McCarthey for the 16 months prior to receiving his K-1's? Where
was Todd Brashear for those 16 months? McCarthey was represented not just by his CFO Todd
Brashear ("Brashear"), but by Milbank Tweed ("Milbank") in New York and by JP Morgan
Chase ("JP Morgan"), not to mention Egger. All McCarthey or Brashear had to do was pick up
the telephone and demand either a written statement or redemption, but they claim they did not.
This complete non-action appears incompatible with the personality of either McCarthey or Mr.
Brashear.

A more likely truth is that they knew of the losses, at least roughly, from either
Egger or from Shah directly, and they decided to let Shah gamble to get the money back, like
doubling down in Vegas. It also beggars the imagination that Brashear was not jumping up and
down to get approximate losses for tax planning purposes. Again, the more likely truth is that
they knew, but they were burying their heads in the sand and hoping for a turnaround. Shah's
testimony, that they knew all along, is actually more credible than McCarthey's testimony that
they had no idea what was happening for 16 months but did nothing.

In August 2003 when they received the 2002 K-1's, showing more than 40%
losses, what did McCarthey and Brashear do? They did not redeem their investment or threaten
to. They did not demand an NAV. They did not contact the fund's prime broker. They did not

4

contact the NFA or the CFTC. They did not send anyone over from JP Morgan or Milbank. If they were surprised, it was not a drastic reaction. There is no demand letter, no memorandum of understanding, not even a confirming e-mail to Shah, not even an internal memo. They told Shah to try to make up the losses, just as (he claims, and they deny) they had told him in August of 2002 – "keep your head down and keep on trading".

Shah had not sent a quarterly statement at the end of July 2003. That was the fifth quarterly statement that had not been sent. There is no request by McCarthey or Brashear for any of these, nor is there any request for the September 2003 quarterly statement. Thus, there is no written request for a quarterly statement or NAV from the beginning in April 2002 until January 2004, a period of more than 20 months. This suggests that they did not want or need them, or that they were burying their heads in the sand.

The fact is that McCarthey actually made money, about $350,000, from August 25, 2003 until redemption. So anything that happened later caused no damages.

### The Arbitration

On or about May 3, 2006, the NFA appointed a three-member panel to conduct a hearing prompted by a Demand for Arbitration served upon Shah and the Respondents by Petitioners. The issues raised thereafter are discussed in Point II of the Argument below.

**ARGUMENT**

**POINT I**

**THIS COURT LACKS SUBJECT MATTER JURISDICTION.**

On or about October 10, 2005, Respondents filed Submission Agreements to the NFA in which each provided they submitted to "the jurisdiction of any court of competent jurisdiction which may properly enter judgment." *Affidavit of Paul J. Bazil,* ¶3.  However, it is well-settled that the Federal Arbitration Act ("FAA"), in itself, "does not confer subject matter jurisdiction on the federal courts even though it creates federal substantive law." *Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22, 25 (2d Cir. 2000); *see also, Coastal Caisson Corp. v. E.E. Cruz, et al,* Slip Copy, 2007 WL 2285936 (S.D.N.Y.) at 3.  Alternatively, "[t]here must be an independent basis of jurisdiction before a district court may entertain petitions under the [FAA]." *Perpetual Sec., Inc. v. Tang,* 290 F.3d 132, 136 (2d Cir. 2002); *see also Coastal Caisson Corp.,* 2007 WL 2285936 at 3.  Diversity of citizenship or a federal question is necessary to establish federal jurisdiction.  *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25, n. 32 (1983).

As alleged in the Petitions to Confirm, Petitioners MI and JFM, and Respondents LAM and LCM, are all organized under Delaware law.   Therefore, no diversity of citizenship exists to establish federal subject matter jurisdiction in this case.  Additionally, the Petitioner has failed to assert any federal question, or to state that jurisdiction is proper at all, in its Petition to Confirm, despite being required to do so under Fed. R. Civ. Proc. Rule 8 (stating that "a short and plain statement of the grounds upon which the court's jurisdiction depends" shall be pleaded).  *Fed. R. Civ. Pro. Rule 8(a)(1).*  Petitioner only asserts that federal jurisdiction exists

when checking the "Federal Question" check box as its "Basis for Jurisdiction" on its undated Civil Cover Sheet, but does not elaborate on the Cover Sheet or in its Petition to Confirm as to what it claims constitutes a federal question.

Additionally, solely because the underlying dispute, which was submitted to arbitration, contained federal securities fraud claims, this should not serve as a basis for obtaining federal subject matter jurisdiction as a federal question. This type of action to enforce an arbitration award is simply a contract case, as noted by the Federal District Court in a case in Illinois, where federal jurisdiction on this basis was found to not exist. *O'Leary v. Fanghella*, N.D.Ill. 1994, 866 F.Supp. 1119.

Moreover, all claims in dispute at the arbitration hearing were consolidated cases alleging the same acts by Respondents. The three matters were heard together by the arbitration panel. Petitioners addressed statute of limitations issues by consolidating the three cases. Despite this, Petitioners have filed three separate Petitions to Confirm including by individual Petitioner 2001 Jane F. McCarthey GRAT No. 5 ("McCarthey GRAT"). These three Petitions are, in reality, all one action against Respondents. Accordingly, there is not complete diversity of citizenship, and federal question jurisdiction does not exist. Therefore, the petitions should be dismissed.

**POINT II**

**THE ARBITRATION AWARD VIOLATES PUBLIC POLICY**

An arbitration award which is contrary to "well defined and dominant" public policy is unenforceable. *W.R. Grace & Co. v. Local 759, Int'l Union of the United Rubber Workers,* 461 U.S. 757, 766 (1983). In the case at hand, there unmistakably existed bias, corruption and impropriety on the part of the arbitrators, exhibited by the Panel's secreting key

7

disclosures to the parties (see Shah Affidavit) and plainly ignoring applicable and relevant legal doctrines and overwhelming evidence contrary their ultimate award.  To allow a private arbitration body to circumvent the boundaries of justice through confirmation of such a tainted award would be contrary to public policy.

### A.    The Arbitration Panel and NFA Were Biased, Partial and Corrupt

#### 1.    The Panel

Each of the arbitrators chosen for the Panel had biases and/or improprieties which unfairly prejudiced Respondents' rights, and which were not fully disclosed prior to the hearing. The individual infections of the Panel, in combination with the unjust and unfair decisions actually rendered by the Panel during the course of the arbitration hearings, demonstrate such a serious flouting of the governing statute and rules as to call into question the essential purposes and policies of the NFA dispute resolution process.

The Chairman of the Panel, Mr. Charles P. Nastro, was a former head of the NFA and adjudicated the arbitration hearings under the preconceived notion that the NFA could do no wrong. (*See* Affidavit of Abbas Shah). During the course of the hearing, he refused to question evidentiary documents submitted by the NFA, despite Respondents' counsel's attempt to examine them, and justifying his ruling saying "These are NFA documents." (*See* Affidavit of Abbas Shah).

A second member of the Panel had further conflicts of interest undisclosed at the time of the Panel's selection. During the course of the hearings, Shah learned that Panel member, James D. Yellen, was a school classmate of Petitioners' attorney, Anthony Djinis. Yellen and Djinis were regularly observed in ex parte conversations during hearing breaks and to which no other party to the hearing was present. (*See* Affidavit of Abbas Shah).

8

Incredibly, the third panel member, Henry Maringer, also failed to disclose improprieties prior to his selection to the Panel. Subsequent to the proceedings, Shah learned that Mr. Maringer was sanctioned by the CFTC and was issued a cease and desist order along with a $10,000 penalty. I learned of this fact through CFTC Proceedings Bulletin as of 12/31/04 on page 217 (Docket # 86-36 / 09/30/86 / Reg. Violated: 166.3). (*See* Affidavit of Abbas Shah). It is simply incredible that Mr. Maringer could be permitted to sit on a panel while hiding his past misconduct from Respondents.

Despite biases or improprieties for all three of the Panel members, none of these backgrounds and conflicts of interest were fully disclosed to the Respondents so that they might have exercised their right to object to potential arbitration panel members when an indication of bias or impropriety exists. (*See* Affidavit of Abbas Shah).

Additionally, the Arbitrators' biases were exhibited through specific acts taken by the Panel against the Respondents over the course of the arbitration proceedings. The Panel's bias continued until the final decision, when the Panel awarded the Claimants its entire original investment, without explanation. In effect, McCarthey, who very deliberately and knowingly made an investment in a high risk/high reward strategy with full knowledge of these risks, was granted a retroactive return of his entire investment, shifting all of the risk of loss to the Respondents.

## 2.  **The Process**

The Panel collectively exhibited misconduct by acting contrary to NFA guidelines and refusing to postpone the hearings upon a reasonable request to do so. The Panel unfairly refused to grant Respondents any time whatsoever to acquire additional funds necessary to retain counsel for the duration of the arbitration hearings. Demonstrating the disparate treatment of the

Respondents from other parties to the proceeding, the Panel had previously granted Petitioners' attorney substantial extensions of time to procure evidence and prepare their case. Despite this, when Respondents requested an extension three weeks prior to the hearing to secure funds for legal fees, the Panel replied only three days before the hearing was to begin and denied the request. When Shah informed the Panel that their attorney could not continue representing them without the payment of some past due legal fees, the Panel still arbitrarily refused the request without explanation. (*See* Exhibit A to the Affidavit of Abbas Shah).

### 3.   **The NFA Audit Supervisor**

Despite the NFA ultimately acknowledging that its auditors, in a routine audit, erroneously concluded that the Respondents' brokerage statements showed two separate accounts, when there was in fact only one, Shah was threatened and berated by the NFA supervisor responsible for the audit, Sheryl Tulino, when attempting to correct the NFA's mistaken conclusions prior to the hearing. Shah was threatened by Ms. Tulino when she disparaged him saying "Can't you Indians speak English? [Shah is of Pakistani background] I'm going to see to it that you foreigners are sent back to where you came from." (*See* Affidavit of Abbas Shah).

Claimant Phillip McCarthey testified at the hearing that Ms. Tulino had telephoned him to tell him to withdraw his money from the Linuxor fund, citing NFA's erroneous conclusion that the Companies were trading in two separate accounts, when in fact there was only one account, as the NFA ultimately acknowledged. The hostility of Ms. Tulino, the NFA audit supervisor, essentially made her an ally of the Petitioners during the course of the hearings and seemed to support him in his filing of claims that were false and unwarranted.

**B.   The Case Was Filed Outside the Statute of Limitations.**

As discussed below, the Panel completely disregarded the NFA's own statute of limitations rule stating that the NFA cannot undertake arbitration of a claim if "more than two years have passed since the party making the claim knew (or should have known) of the acts or transactions that are the subject of the dispute." *"NFA Arbitration – Resolving Customer Disputes, p. 3.* The Panel allowed MI to change its original claim from one claimant to add two additional claimants more than one month after the two year Statute of Limitations deadline for filing. (*See* Affidavit of Abbas Shah). McCarthey's advisor, Mr. Eggers, testified at his deposition that Shah informed him in August 2002 (three years before the claim was filed) of the substantial losses incurred since the start of the fund occurring in 2002. He also testified that he had informed McCarthey at the time of these losses by means of both e-mail and verbal discussions. There is an abundance of evidence showing continuous communications between Shah and McCarthey and Mr. Eggers during 2002 and 2003. Despite his own testimony clearly in contradiction, McCarthey's complaint to the NFA claimed that he was not aware of the losses in its portfolio until he received a K1 on August 26th, 2003.

This complaint to the NFA was filed on August 26th, 2005, just one day before the Statute of Limitations, according to McCarthey's story. In fact, McCarthey is on record as having told Shah personally in January 2003 that "we didn't hit the home run we had hoped for, but just keep your head down and keep trading and maybe we can make it." (*See* Affidavit of Abbas Shah). The Panel purposefully ignored all of this evidence in an effort to enable McCarthey's otherwise untimely claims to be triable.

## C.   The Panel Demonstrated a Manifest Disregard of the Law.

Where an arbitrator was "fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it," then the arbitrator has exhibited a manifest disregard of the law. *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,* 333 F.3d 383, 389 (2d Cir. 2003). There exists a three-part inquiry for determining whether an arbitrator has acted in manifest disregard of the law. *Id.* First, the Court must ask whether the law that was allegedly ignored was clear and was explicitly applicable to the matter before the arbitrators. *Id.* at 389 to 90. Second, the Court must determine whether the law was, in fact, improperly applied, giving rise to the erroneous outcome. *Id.* at 390. Third, it must be shown that the arbitrator knew of the existence of the proper governing law, which means that the proper law must have either been identified to the arbitrator by the parties in the arbitration or the error must be so obvious that it would instantly proceed to such by the average person qualified to serve as an arbitrator. *D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 111 (2d Cir. 2006).

### 1.   The Statutes of Limitations Were Clear and Explicitly Applicable to the Matter.

Pursuant to Code Rule ¶ 6035, no claim may be arbitrated by the NFA unless the NFA receives either a claim or a notice of intent to arbitrate within two years of when claimants "knew or should have known of the act or transaction that is the subject of the controversy." The rule further states that the NFA shall reject any claim that is not timely filed and shall terminate the arbitration of such claim without issuing a decision or award. This rule is plainly apparent and applicable, especially before an arbitration panel of the National Futures Association, itself. In addition to the jurisdictional bar to arbitration of claims more than two years old, the substantive claims under federal securities fraud, federal commodity fraud, securities fraud under Utah law were each barred by the respective statutes of limitation. Each

substantive statute has a strict two year limitation period, which were clearly presented to the Panel and explicitly applicable to the matter, as there claims were ones filed by the Petitioner and presented for the Panel's resolution.

**2.    The Law Was Improperly Applied by the Panel**

*a. All Claims That Arose Before August 25, 2003 Are Barred By the Applicable NFA Statute of Limitations*

The arbitration was barred by the National Futures Association ("NFA") time period restrictions set forth in Rule ¶ 6035 of the NFA Code of Arbitration (the "Code"). The instant Claims were filed with the NFA on October 25, 2005. Therefore, if Claimants knew or should have known of the acts giving rise to their Claims prior to October 25, 2003, then their Claims are time-barred and must be dismissed.

As procedural background, on August 26, 2005, the Claimants initially attempted to file their Claims as a single consolidated proceeding. In cases like this, the NFA's filing instructions allow claimants a 20-day grace period in which to file new, separate claims. If claimants fail to correct their error and re-file within this grace period, the NFA will automatically reject the filing in its entirety and deem that no claim was ever initiated.

In the instant proceeding, Claimants did not re-file their separate Claims until October 25, 2005, nearly two months after their original filing error. Therefore, Claimants' original claim filed on August 26, 2005 should have been disregarded in its entirety, and the Claimants' separate Claims must be considered filed no earlier than October 25, 2005.

With respect to the matter at hand, the threshold question for the Court to decide is: when did Petitioners' claims accrue? Specifically, when did the Petitioners know or when should they have known of the allegedly fraudulent acts that are the subject of their Claims?

13

Petitioners stated in its Arbitration Claim Forms that they first knew a dispute existed on July 9, 2004.   This allegation is belied by the fact that no later than August 25, 2003, upon their receipt of their Federal Form 1065 K-1 Schedules (the "K-1 Schedules"), Petitioners actually knew that their investments in the Fund had lost approximately 43% in 2002.

However, regardless of when Petitioners allege they actually knew of the possibility of a fraud, the law imposes inquiry or constructive notice on Petitioner when circumstances would suggest to a reasonable investor of ordinary intelligence that there might be some wrongdoing.  *See Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2nd Cir. 1993) (holding that an inexperienced, uneducated investor was put on inquiry notice of the risk of her portfolio at the moment she was provided with prospectuses explaining the risks  even if she did not read or understand them).

Through the doctrine of inquiry notice, courts impute knowledge to the investor regardless of whether he ever actually inquired.  In *Sterlin v. Biomune Systems, Inc.*, 154 F.3d 1191, 1203 (10th Cir. 1998), the court stated that Petitioner "'need not... have fully discovered the nature and extent of the fraud before [they were] on notice that something may have been amiss.  Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself'" (quoting *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st Cir. 1987)).  *Phillips v. Levie*, 593 F.2d 459, 462 (2nd Cir. 1979), echoes this proposition:  "[C]ommencement of the statutory period does not await a plaintiff's 'leisurely discovery of the full details of the alleged scheme'" (quoting *Klein v. Bower*, 421 F.2d 338, 343 (2nd Cir. 1970)).  *See also Dodds v. Cigna Secs., Inc., supra*, at 352 (2nd Cir. 1993).

In this case, Petitioners had sufficient knowledge of facts which, in the exercise of reasonable diligence, would have led to actual knowledge, if there had been anything to know.

14

Petitioners point to Respondents' allegedly misleading statements and alleged failure to provide timely quarterly and annual financial statements as evidence that Respondents were intentionally concealing the Fund's losses. Assuming, *arguendo*, the truth of this assertion, Petitioners were on inquiry or constructive notice of a potential claim as early as July 30, 2002, when they did not receive their first "official" quarterly account statement for the period ending June 30, 2002; or on October 30, 2002, when they did not receive their second consecutive "official" quarterly statement. If Petitioners had, as they now allege, insufficient communication with Respondents during their first year in the Fund, then this should have alerted them to the possibility of a claim.

More important, in or about August 2002, in a conference call with Phillip McCarthey ("McCarthey"), who was authorized to act on behalf of all three of the arbitration's Claimants concerning their Fund investments, and Todd Brashear ("Mr. Brashear"), Claimants' financial adviser, Shah advised them that the Fund had recently suffered losses of approximately $3,500,000, or 32% and also discussed his plan for trying to recover them. During such call, with every right to terminate their investment, Petitioner elected to continue in the Fund, notwithstanding their actual knowledge of the Fund's formidable losses and of the continued high risk. Petitioners cannot now claim, more than three years hence, that they were shocked to discover continuing losses in the Fund.

Though Respondents assert that Petitioners were on inquiry notice in August 2002, the latest possible time that Petitioners can reasonably argue that they had inquiry or actual notice of the facts giving rise to their claims is August 25, 2003, when Mr. Brashear confirmed to Shah that Petitioners had received its 2002 K-1 Schedules. Moreover, as indicated by covering letters dated August 12, 2003, the Fund's auditors, Rothstein Kass & Company, P.C. ("RKC"),

mailed Petitioner their 2002 K-1 Schedules, which clearly show that Petitioner had lost 43% of their investments as of December 31, 2002.

Therefore, it is indisputable that Petitioners had an accurate picture of the Fund's poor performance no later than August 25, 2003, as it was unambiguously disclosed in the K-1 Schedules and was more than sufficient to place a reasonable investor on notice of a potential claim against Respondents. Petitioners allege that they expected healthy returns on their investments based on Respondents' representations, but discovered instead at this time that they had suffered dramatic losses. The stark contrast between the reported staggering losses and Respondents' alleged representations of healthy profits would suggest to reasonable investors that they should inquire into the possibility of misconduct. As the United States Court of Appeals for the Second Circuit clearly held, "[W]here the company's public disclosure reveals that a particular representation about a crucial feature of an investment has not materialized, the statute of limitations is triggered." *Pilarczyk v. Morrison Knudsen Corp.*, 965 F. Supp. 311, 318 (N.D.N.Y. 1997), *aff'd*, 162 F.3d 1148 (2nd Cir. 1998) (*quoting Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1411 (S.D.N.Y. 1996)).

Losses of this magnitude, the allegedly inconsistent communications and the realization that the Fund was not operating as allegedly promised would have triggered suspicions in reasonable investors in 2002, and certainly no later than the time they received their K-1 Schedules in August 2003. Petitioners must be held to this objective standard, especially in light of Petitioners' status as "qualified eligible persons" pursuant to Rule 4.7 under the Commodity Exchange Act, and their sophistication in investment matters. However, as high risk gamblers, Petitioners chose to continue in the Fund, (i) without lodging a single complaint with Respondents or any other party, (ii) without conducting any further inquiry, (iii) without

scheduling any meeting to discuss the matter, (iv) without performing any additional due diligence with respect to the Fund or any Respondent, (v) without redeeming all or any part of their investments, and (vi) by rallying behind Shah and instructing him to continue managing the Fund to achieve the highest rate of return possible, without regard to risk.

Once on inquiry notice, Petitioners had a duty to conduct a prompt and diligent investigation to discover the facts giving rise to their Claims. Failing this, Petitioners are estopped from seeking redress of their Claims years later.

Petitioners may not elect to continue participating in the Fund long after they were on inquiry notice of a possible fraud in the hope that their investments could be salvaged only to file claims later. *See Anixter v. Home Stake Prod. Co.*, 977 F.2d 1549, 1552 (10th Cir. 1992) (holding that the purpose of the analogous securities fraud statute of limitations is "to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act").

In summary, Petitioners filed their claims with the NFA on October 25, 2005, exactly two years and two months after August 25, 2003, the latest time that they can argue that they were on inquiry or actual notice of the acts of which they now complain. Therefore, under Code Rule ¶ 6035, since Petitioners failed to bring this arbitration proceeding within two years of being on actual or inquiry notice, this proceeding should have been dismissed without decision or award. Notably, Petitioners' failure to file their Claims within the NFA Code of Arbitration's time restraints constitutes a jurisdictional error, meriting the disposal of all of the Claims brought before the Arbitration Panel.

**b.    *The Substantive Claims of Federal Securities Fraud,
Federal Commodity Fraud, and Securities Fraud Under
Utah Law Were Each Barred By Respective Statutes of Limitations.***

In addition to the jurisdictional bar to arbitration of claims more than two years

old, the substantive claims under federal securities fraud, federal commodity fraud, and securities

fraud under Utah law were each barred by the respective statutes of limitation.  Each substantive

statute has a strict two-year limitations period, which required the Panel to dismiss those claims

as a matter of law for all matters which arose more than two years before this claim was filed.

Petitioners alleged that Respondents violated §10(b) of the Securities Exchange

Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by inducing

Petitioner to participate in the Fund through knowing or reckless material misrepresentations

about how the Fund would be managed, the risk of loss to investors, the number of other

investors in the Fund, and the size of the other investors' investments.  Petitioners further allege

that Respondents induced them to stay in the Fund by making knowing or reckless material

misrepresentations about the Fund's performance and the value of Petitioners' accounts, by

failing to provide quarterly and annual statements, and by otherwise concealing materially

adverse information about Petitioners' investments in the Fund.

Although Respondents wholly denied each of these allegations, this cause of

action is barred by the applicable statute of limitations.  Since the enactment of the Sarbanes-

Oxley Act of 2002, 28 U.S.C. § 1658, claims raised by private parties under the federal securities

fraud statutes and regulations fall under a rigid statute of limitations which is two years after

discovery of the alleged wrong, or five years after the alleged wrong, whichever is earlier.  This

limitations period is not subject to equitable tolling.  *See Lampf v. Gilbertson*, 501 U.S. 350, 363

(1991).  The statute of limitations begins to run upon either actual or inquiry notice of facts

constituting fraud.  *See Tregenza v. Great Amer. Comm. Co.*, 12 F.3d 717, 722 (7th Cir. 1993).

Here, Petitioners were undoubtedly on inquiry notice no later than August 25, 2003, the date on

which Mr. Brashear confirmed to Shah that Petitioner had received the K-1 Schedules for

Petitioners' accounts.

        Petitioners also alleged that Respondents violated § 4o of the Commodity

Exchange Act, 7 U.S.C. § 6o. This cause of action is also barred by the applicable statute of

limitations.  Private claims brought under the Commodity Exchange Act are subject to a two-

year statute of limitations pursuant to 7 U.S.C. § 25(c).  The Act specifies that this is two years

after the date the cause of action arises.  In *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

928 F.2d 238 (7th Cir. 1991), the Court of Appeals held that for purposes of this statute of

limitations, the cause of action arises at the time that the investor knows of and understands the

amount of his losses and the reason for them, regardless of whether the investor's account

remained open after this point in time.  Likewise, in *Rotter v. Leahy*, 93 F. Supp. 2d 487, 500

(S.D.N.Y. 2000), the court stated that the limitations period begins to run when "circumstances

would suggest to a person of ordinary intelligence the probability that he has been defrauded"

(quoting *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2nd Cir. 1994)).  At that time, the

court stated, the investor has a duty to inquire further, and if he does not, the court will impute

knowledge to him.  Here again, Petitioners were on inquiry notice no later than August 25, 2003,

the date on which Mr. Brashear confirmed with Shah his receipt of the K-1 Schedules for

Petitioners' accounts.

        Petitioners also argued that the aforementioned alleged misrepresentations and

omissions also violated the Utah Uniform Securities Act, Utah Code Ann. §§ 61-1-1(2), 61-1-

22(1) and (3). This claim was also barred by the applicable statute of limitations.  Private claims

brought under the Utah Uniform Securities Act are subject to a two-year statute of limitations pursuant to Utah Code Ann. § 61-1-22(7)(a). The Act specifies that this is two years after the discovery of the facts constituting the alleged violation, or four years after the act constituting the alleged violation, whichever is earlier. As stated before, Petitioners were on notice no later than August 25, 2003, the date on which Respondents confirmed with Mr. Brashear receipt of the 2002 K-1 Schedules for Petitioners' accounts.

Petitioners' failure to file their Claims within the NFA Code of Arbitration's time restraints bars jurisdiction over matters more than two years before the filing date meriting the disposal of all of the Claims brought before the Arbitration Panel. No liability claims can be arbitrated that arose more than two years before filing, and there were no trading losses in the period from August 31, 2003 to August 25, 2005[4]; thus the entire arbitration claim should have been dismissed.

Even if McCarthey and Brashear were telling the unlikely truth about actually not knowing anything prior to August 25, 2003, the statute of limitations defense would still apply, because they should have known. There were red flags flying everywhere. All they had to do was pick up the phone or send a letter. Since the investors were on inquiry notice much earlier than August of 2003, everything prior to August 25, 2003 is absolutely barred as a matter of law. Indeed, the Arbitration Panel did not have jurisdiction over matters that existed more than two years before the filing date of August 25, 2005.

---

[4] Petitioners suffered no losses from August 31, 2003 through the date of their complete redemption in early July 2004. On August 31, 2003, Petitioners' investments were worth $3,657,962. In July 2004, Petitioners' redeemed

### 3.    The Panel Knew of the Existence of the Statutes of Limitations.

Moreover, the Panel was made aware of the existence of these Statutes of Limitations and completely disregarded them. Respondents brought these applicable Statutes of Limitations to the attention of the Panel, and clearly explained how these claims were barred on December 22, 2005 (Respondent's Motion to Dismiss and Statement of Answer, 2-8). Despite overwhelming evidence to the contrary, the Panel intentionally ignored Respondent's claims with virtually no explanation.

### D.    There Was No Fraud.

Petitioners have failed to prove the essential elements of fraud pursuant to the federal securities laws, the federal commodities laws, Utah's securities statutes or the common law. Each of these regimes requires Petitioners to prove at least the following elements of fraud: 1) that Respondents made an affirmative misrepresentation; 2) of material fact; 3) which Petitioners relied upon; 4) justifiably; 5) causing Petitioners to suffer damages.

### 1.    Number of Other Investors and Amount Invested in Fund

Petitioners allege that they were induced to invest in the Fund based on certain oral representations, allegedly made in late 2001, regarding how many other investors were already in the Fund and how much those investors had invested.

Respondents deny ever making such representations; however, even if Respondents had orally misrepresented the number of other investors in the Fund and the amount those investors had invested, Petitioners' allegations of fraud cannot stand, because such representations were not material. If such information were, as Petitioners allege, critical to Petitioners' decision to invest in March 2002, then Petitioners should have demanded a written representation of such facts. The most reasonable explanation for Petitioners' never having

---

investments were worth $4,002,899.

requested this or any other historical information about the Fund is either 1) that Petitioners already knew that the Fund was brand-new with no preexisting investors; or 2) that such information was not, in fact, material to their decision to invest.

Furthermore, Respondents fully disclosed in writing in the Fund's Confidential Offering Memorandum ("COM") [Resp. Ex. B-1], which Petitioners acknowledge having received and read in early 2002, that the Fund was a newly-formed entity with no performance history:

> **Limited Operating History**.  Although the Managing Member and the Investment Manager have had significant experience investing and trading equity securities and commodity interests … both the Investment Manager and the Fund are newly-formed entities with no history of operating performance.  (emphasis added) (COM, pg. 17).

Mr. Brashear similarly testified that both Mr. Zacharella of Rothstein Kass and Shah told him, in separate conversations in or around April 2003, that 2002 was the Fund's first year of existence. (See, Brashear Dep., pgs. 69-70.)

Neither Mr. Brashear nor McCarthey, however, questioned, objected to or commented on this issue to Respondents at any time.  Viewed as a whole, these facts demonstrate that either 1) Respondents never made such a representation; or 2) in deciding to invest, Petitioners did not rely upon or consider material the number of investors in the Fund and the amount they purportedly invested.

Furthermore, Petitioners allege that they did not learn that they comprised the overwhelming majority of the Fund until they received their 2002 K-1's in August or September 2003; yet Petitioners did not seek redemption at that time to place their investments in a larger pool.  On the contrary, Petitioners continued in the Fund notwithstanding.  Thus, Petitioners waived their right to assert that Respondents fraudulently induced them to invest based on such a

representation.  *See Black v. Riker Maxson Corporation*, 401 F. Supp. 693, 700 (S.D.N.Y. 1975) (holding that an investor had waived his claim for fraud related to certain earnings statements where the investor learned the facts but never complained or sought to confirm any facts, despite multiple opportunities to do so, until he filed his complaint over two years later).

**2.    15% Stop-Loss Policy**

Petitioners also allege that Respondents fraudulently induced them to invest in the Fund in late 2001 by orally representing the existence of a 15% stop-loss policy on their investments.  Although Respondents deny ever making this representation, even if they had, such a representation would necessarily have been a promise to do something in the future, which cannot be a legal basis for fraud.

In *Lanzi v. Brooks*, 54 A.D.2d 1057, 388 N.Y.S.2d 946 (3rd Dept. 1976), the court held that a statement of future intention cannot be the basis for fraud unless plaintiff sufficiently alleges facts showing that the defendant never intended to honor or act on the statement, and such facts may not be inferred from the fact that the stated expectation did not occur.  *See also Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (stating that under federal securities law, forward-looking statements are not actionable merely because they turn out to be misguided); *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.,* 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003, 1004 (1986) (holding that a mere promise to do something in the future is not actionable as fraud absent proof of present intent to not abide by that promise). Petitioners have failed to offer sufficient proof that Respondents did not intend to abide by the alleged 15% stop-loss representation; thus, their claims for fraud based on this representation, and any other statement of future intention, should have been dismissed.

23

Furthermore, Petitioners may not rely on this oral representation in the face of the cautionary statements contained in the offering materials. It is well-settled that these cautionary statements preclude recovery for fraud: "If a literate, competent adult is given a document that in readable and comprehensible prose says X (X might be, "this is a risky investment"), and the person who hands it to him tells him, orally, not-X ("this is a safe investment"), our literate, competent adult cannot maintain an action for fraud against the issuer of the document." *Carr v. Cigna Securities, Inc.*, 95 F.3d 544, 547 (7th Cir. 1996).

Additionally, Petitioners' suggestion that they relied on the 15% stop-loss representation is belied by Petitioners' other contemporaneous statements about the performance of their investments. Notably, Mr. Egger, Petitioners' apparent agent with respect to these investments, wrote an e-mail to Shah, with a copy to McCarthey, dated August 15, 2002, in which he stated that he understood that Shah had "not hit the homerun we were hoping for," and made references to "3-400% gains." See Resp. Ex. C-1. These statements show that Petitioners' investment objective all along was to shoot for huge gains, and Petitioners are knowledgeable and experienced enough investors to recognize that such gains cannot be obtained while also limiting Petitioners' risk of loss to no more than 15%.[5]

### 3.  Risk Management

Petitioners' allegations regarding the risk of loss representations in the COM are similarly insufficient to serve as a basis for fraud. These representations are also future predictions, expressed in future or conditional terms, projecting what the investment manager "will" do, or actions the Fund "expects to" take. (COM, pg. 7). On their face, then, these representations are not legally fraudulent, regardless of whether they were adhered to, or

---

[5] Petitioners have feigned ignorance on this point, but their investment experience belies their claims. Mr. Brashear testified at the hearing that Petitioners were also invested in Leon Cooperman's Omega Advisers hedge fund, which

required to be adhered to. *See Lanzi v. Brooks, supra; Shields v. Citytrust Bancorp., Inc., supra; Deerfield Communications Corp. v. Chesebrough-Ponds, Inc., supra.*

Furthermore, Petitioners selectively point to certain sections of the COM in support of their claim that Respondents misrepresented the risks associated with their investments, but Petitioners then turn a selective blind eye to the numerous cautionary statements in the offering materials, which clearly state that an investment in the Fund involves a high degree of risk and that investors must be prepared to lose their entire investment in the Fund.

Petitioners acknowledged both in writing (Subscription Agreement ["SA"], pg. 15) [Resp. Ex. B-3] and in sworn testimony that they received and read the Fund's Confidential Offering Memorandum, Investment Management Agreement, Limited Partnership Agreement and Subscription Agreement in early 2002, so they must have seen the following unambiguous risk disclosure and policy statements:

> There can be no assurances that the Fund's objectives will be satisfied. (COM, pg. 2).

> The Investment Manager has wide latitude in choosing Fund investments. Although the Investment Manager's proprietary trading system emphasizes multi-asset diversification and follows a set of money management rules that limit the amount of Fund assets committed to each trade, market, and country (as disclosed above), the Investment Management Agreement imposes no limits on the types of securities or other instruments in which the Fund may invest, the types of positions it may take, the concentration of its investments (whether by sector, industry, fund, country, asset class or otherwise) the amount of leverage it may employ or the number or nature of short positions it may take. Further, depending on conditions and trends in the financial markets, the Investment Manager may pursue other strategies or employ other techniques it considers appropriate and in the Fund's best interests. (emphasis added) (COM, pg. 12).

> An investment in the Fund involves significant risks. Some of those risks are summarized below. Some are discussed more fully elsewhere in this Memorandum. Prospective investors should carefully consider all the risks discussed below and should consult their own legal, tax, and financial advisers

---

is only open to highly sophisticated investors.

<u>about these risks and an investment in the Fund generally</u>.  (emphasis added) (COM, pg. 16).

**Not a Complete Investment Program.**  An investment in the Fund may be deemed a speculative investment and is not intended as a complete investment program. It is designed only for sophisticated and experienced investors who can bear the risk of loss of their entire investment in the Fund. (COM, pg. 17).

**Changes in Investment Strategies.**  The Investment Management Agreement gives the Investment Manager broad discretion to expand, revise or contract the Fund's business without the consent of the Limited Partners.  <u>Thus, the investment strategies described elsewhere in this Memorandum may be altered without prior approval by, or notice to, the Limited Partners</u> if the Investment Manager determines that such change is in the best interests of the Fund.  Any such decision to engage in a <u>new activity could result in the exposure of the Fund's capital to additional risks which may be substantial</u>.  (emphasis added) (COM, pg 18).

(c)  Review of Offering Materials and Independent Advice. Subscriber has carefully reviewed the Confidential Offering Memorandum (the *"Offering Memorandum")* relating to the Fund's Offering of Interests and its exhibits (including the Partnership Agreement and the Investment Management Agreement) and has discussed with Fund representatives any questions Subscriber may have had as to such materials or the Fund or the business, operation or financial condition of the Fund or the General Partner or the Investment Manager. Subscriber understands the risks of this investment, as described in the "Certain Risk Factors" section and other portions of the Offering Memorandum, and the conflicts of interest to which the General Partner and the Investment Manager will be subject. <u>In deciding to invest in Interests, Subscriber has not relied on any statements or information other than those contained in the Offering Memorandum and its exhibits,</u> as amended and supplemented, and in financial statements provided by the General Partner. Subscriber has consulted with Subscriber's own legal, accounting, tax, investment and other advisers in connection with this investment, to the extent that Subscriber has deemed necessary.  (emphasis added) (SA, pg 15).

These are only a few of numerous statements that fully disclose not only the substantial risks involved in investing in the Fund, but also that the Investment Manager was permitted to change any of the enumerated policies of the offering documents at any time, without notice to the investors.

It is crucial to recognize that McCarthey signed a contract, the Subscription Agreement, stating that he had read and agreed to all of the information in the offering materials, and that, in deciding to invest, he had not relied on any statements or information other than those contained in the offering documents. (SA, pg. 15). This statement alone negates all of Petitioners' claims for fraudulent inducement which are based on statements other than those in the offering documents (i.e., the alleged 15% stop-loss policy, and the alleged misrepresentations involving the number of investors in the Fund and how much they invested), because without reliance, there can be no fraud.

### 4.   Periodic Account Statements

Petitioners contend that Respondents' failure to provide timely quarterly and annual written reports was part of a fraudulent scheme of deceptive acts and practices. At the hearing and at their CFTC depositions, Petitioners asserted that they expected their first quarterly account statements no later than July 2002. (Brashear Dep., pg. 16). Following the progression of calendar quarters, Petitioners would have also expected account statements in October 2002, January 2003, April 2003, July 2003, and so on. They would also have expected an audited annual statement for 2002 by early in 2003. Petitioners later asserted at their CFTC depositions and at the hearing that they failed to receive a single quarterly or annual written statement from Respondents. (McCarthey Dep., pg. 33).

Petitioners then suggest that, in the absence of such documents, Petitioners justifiably relied on Respondents' repeated oral assurances that their $11,500,000.00 investments were doing "just fine." It is incomprehensible that Petitioners, as a sophisticated investors, would have simply shrugged their shoulders, not knowing specifically what happened to $11,500,000.00 of their money for over a year, without once making a formal written request to

Respondents for an account statement, without once requesting their money back, and without once notifying the NFA or the CFTC of Respondents' failure to provide statements. Regardless of what Petitioners now claim, Petitioners' failure to act at the time was a ratification and waiver of Respondents' reporting practices. (*See, Black v. Riker-Maxson Corporation, supra*).

Furthermore, assuming Petitioners' story were true, this would still not amount to fraud, because it is not justifiable for Petitioners to rely on oral statements that the accounts were doing "just fine" as a representation of the performance of the Fund. Petitioners are not the innocent, gullible investors that they make themselves out to be; on the contrary, Petitioners are Qualified Eligible Persons and sophisticated investors.

Additionally, facts uncovered during discovery and at the hearing contradict Petitioners' allegations that they knew nothing of the losses to their accounts before late August 2003. McCarthey admitted under oath that he knew Petitioners' accounts had suffered losses in the first quarter of 2003 based on a telephone conversation he had with Shah at that time. (McCarthey Dep., pg. 44). Similarly, Respondents have shown that on August 14, 2002 they reported significant losses in Petitioners' accounts to Phillip Egger, Petitioners' apparent attorney and agent, and that Egger, McCarthey's former attorney and close friend since college, sent an e-mail to Shah, with a copy to McCarthey, discussing these losses. (Resp. Ex. C-1). The likely truth is that Petitioners at least knew the approximate value of their accounts throughout the entire period of their investment based on informal discussions with Shah on a monthly, if not more frequent, basis.[6] Petitioners remained invested because they were trying to recoup the losses they knew they had suffered in an attempt to "hit a home run", and when this was unsuccessful, they blamed Respondents for their losses. It is well settled that the law does not

---

[6] Respondents were always available to Petitioners, by phone and by e-mail, as is evidenced by their phone records (Resp. Ex. I), their numerous e-mails back and forth to Petitioners (Resp. Ex. F) and Petitioners' own testimony, in

permit such recovery. *See, Black v. Riker-Maxson Corporation, supra* ("The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act.")(quoting *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 213-14 (9th Cir. 1962)).

Petitioners also allege that Respondents affirmatively misrepresented the value and performance of Petitioners' investments in the Fund on four occasions, but Petitioners' allegations are insufficient to make out a claim for fraud.

### 5. **April 2002**

Although McCarthey previously denied receiving it, Petitioners belatedly argued that an internal and informal realized profit and loss statement for a futures account of Linuxor, for the period March 19, 2002 – April 18, 2002 (Cl. Ex. 5), contained a material misrepresentation upon which they now say they relied in investing an additional $10,000,000.00 in the Fund in May 2002. Petitioners have offered neither evidence nor explanation as to when or how they received this document. Respondents have demonstrated that this document did not contain any material misrepresentations; rather, it was an internal report of the realized profit and losses in a futures account of the Fund for the time period stated. It did not purport to be a statement of the entire fund, nor on its face does it purport to be an NAV.[7]

Even if the statement were deemed to be inaccurate or misleading, however, Petitioners have failed to prove – and in fact have denied – that they relied on this statement in deciding to invest an additional $10,000,000.00 in the Fund. McCarthey's sworn testimony at his CFTC deposition is particularly revealing:

---

which they refer to numerous phone calls to and from Shah (Brashear Dep., pg. 21).
[7] Notably, if Petitioners had in fact received this statement, then they would have known at that time that there was not $100,000,000.00 in the Fund; rather, the only funds shown in the Fund were Petitioners' $1,500,000.00. See Cl. Ex. 5.

> Q:    Did you get any documents from Shah between March of '02 after your initial investment and May, '02 when you made the subsequent investment indicating how the fund or your investment was doing?
>
> A:    No.

(McCarthey Dep., pg. 32).  Surely if a financial statement were so material as to induce

Petitioners to invest $10,000,000.00 in reliance on it, then Petitioners would have remembered

that it existed.  The only rational explanations for Petitioners' failure to recall this statement are:

1) Petitioners never received it (or received it only later); or 2) the document was so immaterial

that Petitioners did not rely upon it in their decision to invest additional money in the Fund.

Moreover, assuming, _arguendo_, that Petitioners did rely on this document in

making their additional investment, this still cannot be the basis for a fraud claim because it is

simply not justifiable for sophisticated investors to rely solely on a single, informal, monthly

profit and loss report for a single account such as the April 2002 statement in deciding to invest

$10,000,000.00 in a commodity pool. They could have easily asked for a formal monthly

statement, or they could have sent someone to Shah's office to look at the books.

### 6.    August 25, 2003 E-mail

Petitioners allege that the e-mail sent by Shah to Mr. Brashear on August 25, 2003

contained fraudulent misrepresentations that induced them to remain in the Fund.  Respondents

demonstrated at the hearing that the statements in the e-mail are not misrepresentations but were

accurate statements about certain specific parts and aspects of Petitioners' accounts (the "options

and futures positions") about which Petitioners had inquired, which have been taken out of the

context in which they were written.  However, even if the statements were misleading or unclear,

Petitioners' assertions that this e-mail is a basis for fraud cannot stand, because Petitioners have

failed to prove:  1) that they actually relied on this e-mail in remaining invested in the Fund[8]; 2) that it was justifiable for them to do so; or 3) that Petitioners suffered any damages as a result of having relied on this e-mail.

At his CFTC deposition, McCarthey stated that he did not recall receiving or seeing the e-mail, dated August 25, 2003.  (McCarthey Dep., pg. 104).  If McCarthey was, as he repeatedly emphasized at the hearing, the chief decision-maker with regard to these investments, then surely he would have read the e-mail that Petitioners suggested was of the utmost importance in their decision to remain invested after receiving their K-1 Schedules.

Regardless, a decision to maintain a multimillion dollar investment in the Fund based on vague assurances in an informal e-mail is simply not justifiable.  Petitioners cannot honestly suggest that they were the victims of fraud when their actions at the time fell so far short of what a reasonable investor would do under the circumstances.  Reasonable investors under the circumstances as Petitioners allege, having discovered for the first time over one year after their initial investments that their accounts were down approximately 43% when they were supposedly expecting no more than 15% losses, would either have immediately investigated or would have immediately withdrawn their money from the Fund.  (Of course, reasonable investors would not have gone for over a year without knowing the actual value of their investments in the first place.)  However, remaining invested based on an informal e-mail that the losses were being recovered, after allegedly discovering that the entire first year of their investments had been misrepresented, is not justifiable.

Finally, even if the e-mail were a material misrepresentation upon which Petitioners justifiably relied, there is still no fraud because Petitioners suffered no damages as a

---

[8] A misleading or even actively fraudulent statement that causes someone to remain an investor, as opposed to a statement that induces them to invest, is not a securities law violation because there is no "purchase or sale" of a

result of the e-mail. Petitioners maintained at the hearing that if they had known the truth about their investments in August 2003, then they would have immediately withdrawn their money from the Fund. If Petitioners had redeemed their investments on August 31, 2003, however, they would have received far less than the $4,002,899.00 they ultimately did in July 2004, because the undisputed value of Petitioners' investments on August 31, 2003 was only $3,657,962.00. Thus, the August 25, 2003 e-mail did not cause Petitioners to suffer any damages and cannot legally serve as a basis for fraud.

    7.   **Weekly E-mails**

Regardless of whether the weekly realized profit and loss e-mails contained any misrepresentations, such earnings statements were immaterial, and Petitioners could not justifiably rely upon them as a definitive measure of the value of Petitioners' accounts. They did not purport to be NAV's, nor did they purport to be marked-to-market. *See Black v. Riker-Maxson Corporation, supra* (holding that bare earnings figures, without any supporting documentation, were insufficiently material to be a basis for fraud, and that no reasonable investor would rely on such figures). Anyone looking at these e-mails would have realized that they raised more questions than they answered. McCarthey and Brashear were both sophisticated investors, with a stable of investment specialists on call at Milbank and JP Morgan Chase; if they did not raise questions, it must have been because they chose to remain ignorant.

    8.   **January 30, 2004 E-mail**

Respondents have admitted that the information conveyed in the e-mail, sent January 30, 2004, was incorrect and the result of an inadvertent error; however, the e-mail cannot be the basis for a fraud claim because Petitioners never relied upon this e-mail, let alone justifiably, to their detriment.

---

security. See discussion at pages 19-20, <u>infra</u>.

McCarthey testified at his deposition that although he was "sure [he] would have seen it", he did not take any action as a result of seeing this e-mail. (McCarthey Dep., pg. 106-107). However, even if Petitioners had relied on this e-mail, such reliance would not have been justifiable, since Petitioners knew the e-mail was not a formal statement of the accounts' net asset value, but was only an e-mail in response to Mr. Brashear's request for an informal, approximate balance. (Brashear Dep., pg. 39). Furthermore, even if Respondents had given Petitioners the true value of its investments as of December 31, 2003, and Petitioners had chosen to withdraw their money from the Fund immediately on January 30, 2004, they would have ended up with less money than they ultimately redeemed in July 2004, as the value of the accounts on January 31, 2004 was only $2,519,661.00. Thus, Petitioners incurred no damages as a result of this e-mail.

9. **May 2004 Oral Statement of Account Value**

Petitioners are legally precluded from asserting that they justifiably relied on oral statements, allegedly made over the telephone in May 2004, regarding the value of their accounts. *See Black v. Riker-Maxson Corporation, supra* (holding that no reasonable investors would rely on bare numbers as a measure of their investments in the absence of supporting documentation).

10. **There Was No Causation.**

Many of the alleged misrepresentations in this case occurred at a time when Petitioners' accounts had less value than Petitioners ultimately redeemed, so even if Petitioner had known the truth and redeemed their investments immediately, they would have received less than they actually did in July 2004. Beyond this, however, is the element of causation which Petitioners have failed to prove on any of their claims.

Laub v. Faessel, 981 F. Supp. 870 (S.D.N.Y. 1997), precludes recovery for fraud where causation is not adequately proven. Laub states:

> [Plaintiff] has not made any allegation that [defendant's] misrepresentation caused the loss incurred under any specific stock in [Plaintiff's] portfolio. He merely alleges that, due to [defendant's] deceit, he paid [defendant] for fraudulent services from which he may have been induced to purchase as he did. The complaint makes no claim, however, that the asserted losses flow directly and foreseeably from [defendant's] misrepresentations, but rather, it appears, from the market forces to which all investors are subject.

Id. at 872. Since the plaintiff in Laub failed to prove causation, the court dismissed the complaint in its entirety.

Similarly, regardless of any alleged misrepresentations by Respondents, Petitioners cannot change the fact that they lost over $7,000,000.00 because they made a risky bet on the market, and the market did not respond as they had hoped. Almost all of Petitioners' money was lost in trading within the first few months of their investment[9]; thus, this injury occurred as a result of market fluctuations, not as a result of Respondents' actions or misrepresentations. It is also worth noting that Respondents did not profit from Petitioners' trading losses.

**11. There Was No Intent to Defraud.**

Petitioners have failed to prove that Respondents ever intentionally misrepresented any material fact regarding the Fund. It is important to note that negligence, or the departure from accepted standards and rules of practice, does not equal fraud. Setting aside the fact that Petitioners specifically told Respondents that they did not want formal periodic reports other than year-end reports, under all of the fraud regimes pled by Petitioners, the mere failure to act in a manner consistent with a reasonable and prudent investment manager, without

---

[9] At the end of August 2002, the value of Petitioners' accounts was $5,044,356; this was less than the value of the account during May 2004, $5,383,124, when the NFA and later McCarthey, requested liquidation.

more, will not suffice to establish a claim for fraud; there must have been reckless or willful conduct on the part of Respondents which caused losses to Petitioners. *See Kearney v. Prudential-Bache Securities Inc.*, 701 F. Supp. 416, 428 (S.D.N.Y. 1988) (holding that negligent conduct is insufficient to make out a claim for commodities fraud). Petitioners have failed to prove scienter on any of their claims for fraud; therefore, their claims must have failed as a matter of law.

## 12. **The Transactions Were Not in Connection with a Purchase or Sale.**

Petitioners' claims for fraud under Section 10(b) or Rule 10b-5 must fail for the additional reason that 10(b) claims must relate to "the purchase or sale of securities." Here, Petitioners' claims are not connected with the purchase or sale of securities, but with interests which were allegedly held longer than they would have been had Petitioners known the facts. It is well settled that investors who allege that they did <u>not</u> sell their shares because they relied upon "an unduly rosy representation or a failure to disclose unfavorable material" cannot sue on 10b-5. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737-38 (1975); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2nd Cir. 1952) (holding that 10b-5 actions must relate to the purchase or sale of securities, and may not be based on the fraudulent management of corporate affairs); *Lowe v. Salomon Smith Barney, Inc.*, 206 F.Supp.2d 442 (W.D.N.Y. 2002) ("It is well established that mere retention of securities in reliance on material misrepresentations or omissions does not form the basis for a § 10(b) or Rule 10b-5 claim.") Notably, the Utah securities statute also requires that the alleged fraud be in connection with the offer, purchase or sale of securities. <u>See</u> U.C.A. § 61-1-1. Because Petitioners' claims involve the retention of securities in reliance on alleged misrepresentations, their fraud claims pursuant to Utah securities laws, § 10(b) and Rule 10b-5 must fail as a matter of law.

### 13. **Punitive Damages**

Petitioners' claim for punitive damages is wholly inappropriate in this case. "Punitive damages are available only in those limited circumstances where it is necessary to deter defendant and others like it from engaging in conduct that may be characterized as "gross" and "morally reprehensible," and of "'such wanton dishonesty as to imply a criminal indifference to civil obligations'". *New York University v. Continental Ins. Co.*, 87 N.Y.2d 308, 315-16, 662 N.E.2d 763, 639 N.Y.S.2d 283 (1995). Furthermore, Respondents must have engaged in egregious and tortious conduct directed at Petitioners that is symptomatic of a pattern directed at the public generally. *See id.*; *Walker v. Sheldon*, 10 N.Y.2d 401, 233 N.Y.S.2d 488, 179 N.E.2d 497 (1961); *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 614, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994). Petitioners failed to prove that these stringent standards apply to the facts of this case.[10]

### E.     **There Was No Breach of Contract.**

Petitioners allege that Respondents breached the Limited Partnership Agreement ("LPA") by failing to send Petitioners their audited annual financial statements and by failing to provide accurate reports. Petitioners suggest that, had they received accurate valuation reports, they would have liquidated their investments and avoided further losses, but this claim is disingenuous considering the facts of this case.

Petitioners allege that the first time they actually received an accurate valuation of the accounts was in late August or early September 2003, in which Petitioners' accounts showed approximately 43% losses from the beginning of their investments through December 31, 2002.

---

[10] It is worth noting that Shah has an impeccable track record, without so much as a single complaint on his U-5 record. He has worked for some of the largest brokerage firms in the country, including UBS, Deutsche Bank and Lehman Bros., where he worked for nine years. Additionally, Shah's prior fund, InterPacific Capital Management, was so successful that Mr. Temple, an investor in InterPacific, chose to reinvest with Shah.

At that time, Petitioners did not liquidate their investments, but continued in the Fund

notwithstanding and told Respondents to try to recoup the losses. Notably, in August or

September 2003, Petitioners continued in the Fund notwithstanding that they had allegedly not

received their audited annual statement for the year 2002 or any other periodic reports during the

life of the Fund.

It is incomprehensible how Petitioners can suggest that they would have

liquidated had they received an accurate valuation report when, in reality, they chose not to

liquidate after receiving an accurate valuation report in August or September 2003, which

showed significant and allegedly unexpected losses to their accounts. The fact is that Petitioners

were committed to trying to recoup the losses on what was, for them, a small, high-risk

investment, and Petitioners' suggestion that they would have liquidated had they received certain

reports is merely an attempt to manufacture a claim for damages.

Additionally, Section 8.1 of the LPA unequivocally provides that Respondents

may not be held liable for any actions or omissions in connection with the contract or the Fund,

unless such actions or omissions constitute gross negligence or willful violations of the law:

> 8.1.1 *Exculpation.* <u>Neither the General Partner, nor the Investment Manager,</u> nor any member, employee, agent or other Affiliate of the General Partner, nor any board or body with respect to the General Partner or the Fund (each, an "*Indemnitee*") <u>will be liable to any Partner</u> for any act or omission performed or omitted by such Indemnitee in connection with this Agreement or the Fund's business or affairs... <u>and no such act or omission will in and of itself constitute a breach of any duty owed by Indemnitee to the Fund or any Limited Partner</u> hereunder or under the Act, <u>provided such act or omission did not constitute gross negligence or a willful violation of the law</u>.

(emphasis added) (LPA, pg. 16). Petitioners failed to prove that Respondents' failure to send

audited annual account statements was either willful or grossly negligent. To prove gross

negligence, Petitioners had the burden of establishing that Respondents engaged in "conduct that

evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing."

*Colnaghi, U.S.A., Ltd. v. Jewelers Protection Services, Ltd.*, 81 N.Y.2d 821, 611 N.E.2d 282

(1993). Petitioners did not prove that Respondents' alleged failure to send audited annual reports

to Petitioners rises to this level of egregiousness.

Although the Limited Partnership Agreement is a contract between the general

partner and the investors as limited partners, Petitioners have attempted to attach personal

liability to Shah as an alleged alter-ego of the Fund's general partner. To establish personal

liability based on an alter ego theory, Petitioners must prove that Shah disregarded the corporate

form and that he exercised such dominion and control over the corporation that it became a

vehicle for his personal business rather than for corporate purposes. *See Port Chester Electrical*

*Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 656-657, 389 N.Y.S.2d 327, 357 N.E.2d 983 (1976).

Petitioners failed to prove any facts tending to establish that Shah treated any of the Fund's

corporate entities as vehicles for his personal use.

In addition to their fraud claims associated with the 15% downside risk

protection, Petitioners also allege that Respondents breached the LPA by not adhering to the

15% stop-loss policy as an implied term of the LPA. McCarthey stated at his CFTC deposition

that, in the Fall of 2001, Respondents represented that they would implement a 15% downside

risk protection on Petitioners' investments. (McCarthey Dep., pg. 21). Petitioners failed to

acknowledge, however, that in signing the SA, they represented the following:

> (c)  Review of Offering Materials and Independent Advice. <u>Subscriber has
> carefully reviewed the Confidential Offering Memorandum</u> (the *"Offering
> Memorandum"*) relating to the Fund's Offering of Interests <u>and its exhibits
> (including the Partnership Agreement and the Investment Management
> Agreement)</u> and has discussed with Fund representatives any questions Subscriber
> may have had as to such materials or the Fund or the business, operation or
> financial condition of the Fund or the General Partner or the Investment Manager.
> <u>Subscriber understands the risks of this investment, as described in the "Certain</u>

Risk Factors" section and other portions of the Offering Memorandum, and the
conflicts of interest to which the General Partner and the Investment Manager will
be subject. In deciding to invest in Interests, Subscriber has not relied on any
statements or information other than those contained in the Offering
Memorandum and its exhibit, as amended and supplemented, and in financial
statements provided by the General Partner. Subscriber has consulted with
Subscriber's own legal, accounting, tax, investment and other advisers in
connection with this investment, to the extent that Subscriber has deemed
necessary. (emphasis added) (SA, pg. 15).

Since the alleged 15% downside risk protection policy is not represented in any of the Fund's

offering documents, Petitioners are contractually estopped from claiming that they relied on it as

part of the contract. If Petitioners wanted a guarantee, they should have put it in writing and

asked for it.

Petitioners' other claims relating to implied terms that appear nowhere in the four

corners of the offering documents are likewise barred. Petitioners' claim for breach of the

implied covenant of good faith and fair dealing is also impermissible under New York law

because it is duplicative of the breach of contract claim. *See Hall v. EarthLink Network, Inc.*,

396 F.3d 500 (2nd Cir. 2005) ("If the allegations do not go beyond the statement of a mere

contract breach and, relying on the same alleged acts, simply seek the same damages or other

relief already claimed in a companion contract cause of action, they may be disregarded as

superfluous as no additional claim is actually stated.") (quoting *Careau & Co. v. Security Pac.*

*Bus. Credit, Inc.,* 222 Cal.App.3d 1371, 272 Cal.Rptr. 387, 400 (1990)).

Although not addressed in their Statement of Claims, Petitioners alleged at the

hearing that Respondents breached provisions in the COM regarding how and when exit

strategies would be implemented. These strategies included: 1) that the Investment Manager

expects to discontinue a particular investment strategy that caused the Fund to depreciate in

value by 2% or more; 2) that the Investment Manager expects to cease trading if the aggregate

39

value of the Fund's assets depreciated by 10% or greater in any given month; and 3) that the

Investment Manager expects, generally, not to initiate (or increase) commodity interest positions

where the positions require margin amounts greater than 25% of the Fund's assets allocated to

the account. (COM, pgs. 2, 7).[11]

       First and foremost, these policies are not actionable since they are only statements

of expectation and not contractual promises; however, Petitioners' claims are also insufficient

because the investment policies in the COM were modified when Petitioners told Respondents

that they wanted a high-risk, high-return investment. The COM expressly authorizes

Respondents to change the stated investment policies at any time without notice to the investors:

> **Changes in Investment Strategies.** The Investment Management Agreement
> gives the Investment Manager broad discretion to expand, revise or contract the
> Fund's business without the consent of the Limited Partners. Thus, the
> investment strategies described elsewhere in this Memorandum may be altered
> without prior approval by, or notice to, the Limited Partners if the Investment
> Manager determines that such change is in the best interests of the Fund. Any
> such decision to engage in a new activity could result in the exposure of the
> Fund's capital to additional risks which may be substantial. (COM, pg. 18,
> emphasis added).

Additionally, the Investment Objectives, Strategies and Policies section of the COM provides a

clear caveat to the entire section: "There can be no assurances that the Fund will achieve its

objectives." (COM, pg 12). Petitioner may not ignore these sections of the COM, which they

agreed to and acknowledged when they signed the SA, in their attempt to construct a breach of

contract claim.

       The COM enumerated the risk factors involved in investing in the Fund in no

uncertain terms. The investors were warned that the Fund was "designed only for sophisticated

---

[11] Petitioners suggested that ABN Amro, the Fund's Prime Broker, dropped the Fund because of Respondents'
departure from these margin requirements, but this is simply not true. ABN Amro discontinued its services for the
Fund because the aggregate value of the Fund's assets fell below $10,000,000.00. It had nothing to do with any
alleged margin violations.

and experienced investors who can bear the risk of loss of their entire investment in the Fund."
(COM, pg. 17). Petitioners were duly warned about the nature of its investments, and it cannot
now, having lost its money in the market, claim that Respondents' breach of contract caused its
losses.

Significantly, Petitioners lack the privity required to bring a breach of contract
action pursuant to the COM. The COM itself is not a contract, but implicates contractual duties
pursuant to the Investment Management Agreement ("IMA"). The IMA is a contract between
the Investment Manager and the General Partner, and specifically states that it is exclusively for
the benefit of the parties to it and not for any third-party beneficiaries. Because the investors are
not signatories to this agreement, they are not in privity with either contracting party, and any
alleged duties to invest in accordance with the COM do not extend to the investors. For this
reason, the investors have no contractual standing to seek damages for any alleged breaches of
the COM.

## F.   There Was No Breach of Fiduciary Duty.

Petitioners allege that Respondents breached their fiduciary duty to Petitioners by
failing to comply with the policies set forth in the COM and the LPA, and by failing to be
truthful in their communications with Petitioners. Respondents have already addressed
Petitioners' specific allegations of fraud and breach of contract; however, it is worth noting that
the LPA provides that no act or omission by the General Partner, the Investment Manager, or any
member, employee, agent or other Affiliate of the General Partner in connection with the LPA or
the Fund will constitute a breach of any duty owed by them to the Fund or any Limited Partner,
provided such act or omission did not constitute gross negligence or willful violation of the law.
(LPA, pg. 16). Thus, Respondents are not subject to liability for breach of fiduciary duty.

### G.   Issues Regarding Accounting and Expenses

Petitioners pointed to various alleged accounting errors in support of their claim that Respondents engaged in a fraudulent scheme or breached one or another contract; however, Petitioners failed to prove that any of these alleged errors were committed with fraudulent intent or that any of these alleged errors actually caused Petitioners to suffer damages.

Respondents concede that they inadvertently returned the wrong amounts to Mr. Egger and Mr. Temple when they redeemed their investments from the Fund, but Petitioners' calculations in their summary exhibits regarding the amounts that should have been returned to the investors are simply incorrect. The correct computations are contained in Alan Nathan's report, showing that Mr. Temple was in fact overpaid by $42,407.00[12] (Nathan Report, pg. 8, 10, 11, 12); and that Mr. Egger was overpaid by $83,293.00.

The funds that were overpaid to Messrs, Temple and Egger are not, however, rightfully Petitioners'; rather, they are amounts that were owed to the Fund for previously unpaid management fees and allowable expenses. See Nathan Report, pg. 13. Contrary to Petitioners' multiple contentions of improper management expenses, as Mr. Nathan pointed out, the COM permitted Respondents to charge a wide variety of business expenses to the Fund:

> The Fund is responsible for all of the direct costs of administering its business. These include, among other things: brokerage commissions, interest on margin and other borrowings, borrowing charges on securities sold short, custodial fees, legal, research, accounting and audit fees and expenses, tax preparation fees, governmental fees and taxes, bookkeeping and other professional fees, telephone, travel and travel-related expenses in connection with the Fund's activities, costs of Fund reporting, costs of Fund governance activities (such as obtaining Partner consents if and when necessary and appropriate), and all other reasonable

---

[12] It is important to note that Mr. Temple's money was transferred from the Linuxor Asset Management, LLC bank account to the fund account on December 1, 2003, not October 29, 2003, as Petitioners suggest (Cl. Exs. 1.21, 1.22, Nathan Report, p. 8).

expenses related to the management and operation of the Fund and/or the
purchase, sale or transmittal of the Fund assets, as the General Partner determines
in its sole discretion... The General Partner will provide the Fund with office
space, utilities, office equipment and certain administrative services.  To the
extent those facilities and services are not part of the General Partner's own
operating, general administrative, and overhead costs, the Fund will bear its
proportionate share of the associated costs. (COM, pg 15).

Petitioners failed to prove that any management expense was improperly charged. Indeed, by

ultimately underpaying the management fee and allowable expenses, the additional mistaken

redemption amounts of Temple and Egger were paid by the investment manager, who took less

than he was entitled to.  Notably, even after charging Petitioners part of their share of expense

obligations, they too were overpaid at redemption.  Therefore, the funds which properly

remained in the Fund after Petitioners' redemption were for allowable expenses and were not, as

Petitioners allege, funds that were rightfully Petitioners'.

        The Court should not confirm the Awards at issue in this case as they are contrary

to well defined and dominant public policies relating to the longstanding traditions of arbitral

dispute resolution and the resolution of disagreements between private individuals by neutral

decision-makers in general. With the existence of a panel who failed to disclose their own

incredible conflicts of interest and past futures trading violations, and who demonstrated biases

in actuality by refusing to acknowledge evidentiary facts and legal mandates that would have

inevitably changed the outcome of the award had the panel used the reasonable discretion and

judgment of an impartial adjudicator, the public policy associated with the tenets and traditions

of the United States justice system is especially harmed when viewed along with the enormous

cost to the Respondents and the disproportionate and unjustified amount of damages awarded

against them in this matter. Petitioners took on substantial risks seeking to win a big pot with the

riskiest part of his portfolio. The cards went against them, and they now seek to recover their

money from Respondents. But McCarthey received no guarantees, because guarantees were impossible and he did not even ask for one, as he could have. Petitioners cannot now say it was Respondents' money that McCarthey was betting with.

## CONCLUSION

Respondents Abbas A. Shah, Linuxor Asset Management, LLC, and Linuxor Capital Management, LLC request that the Petition to Confirm Arbitration Awards be denied, together with such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        September 8, 2007

**SHIBOLETH, YISRAELI, ROBERTS & ZISMAN, LLP**

By: _Charles B. Manuel, Jr_

Charles B. Manuel, Jr.
Of Counsel
One Penn Plaza, Suite 2527
New York, New York 10119
Tel. 212-244-4111

Attorneys for Respondents Abbas  Shah,
Linuxor Asset Management, LLC, and
Linuxor Capital Management, LLC