**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

Petition of McCarthey Investments, LLC,
     Petitioner,

For an Order Pursuant to the Federal
Arbitration Act, 9 U.S.C. § 1, et. seq.
Confirming an Arbitration Award,

    •  against –

Abbas A. Shah, Linuxor Asset Management,
LLC, and Linuxor Capital Management, LLC,
     Respondents.

               Index No. 07cv5617
               Hon. Denise Cote

---------------------------------------------------------------

---------------------------------------------------------------

Petition of 2001 Jane F. McCarthey GRAT No. 5,
     Petitioner,

For an Order Pursuant to the Federal
Arbitration Act, 9 U.S.C. § 1, et. seq.
Confirming an Arbitration Award,

    •  against –

Abbas A. Shah, Linuxor Asset Management,
LLC, and Linuxor Capital Management, LLC,
     Respondents.

               Index No. 07cv5618
               Hon. Denise Cote

---------------------------------------------------------------

---------------------------------------------------------------

Petition of JFM Holdings L.P.,
     Petitioner,

For an Order Pursuant to the Federal
Arbitration Act, 9 U.S.C. § 1, et. seq.
Confirming an Arbitration Award,

    •  against –

Abbas A. Shah, Linuxor Asset Management,
LLC, and Linuxor Capital Management, LLC,
     Respondents.

               Index No. 07cv5619
               Hon. Denise Cote

---------------------------------------------------------------

**AFFIDAVIT OF PAUL J. BAZIL IN SUPPORT OF AMENDED
PETITIONS TO CONFIRM ARBITRATION AWARD AND REPLY
MEMORANDUM**

1.      I am an attorney and partner of Pickard and Djinis LLP and am personally

familiar with the facts pertinent to this matter.  I submit this affidavit in

support of the Petitioners' Reply Memorandum and Amended Petitions to

Confirm Arbitration Awards duly issued on March 5, 2007 in the arbitration

proceedings between the Petitioners and Respondents conducted before and

under the rules of the National Futures Association entitled McCarthey

Investments, LLC v. Abbas A. Shah, Linuxor Asset Management, LLC and

Linuxor Capital Management, LLC, 05-NFA-107;  JFM Holdings LP v.

Abbas A. Shah, Linuxor Asset Management, LLC and Linuxor Capital

Management, LLC, 05-NFA-132 and 2001 Jane F. McCarthey GRAT No. 5 v.

Abbas A. Shah, Linuxor Asset Management, LLC and Linuxor Capital

Management, LLC, 05-NFA-133.  I have been admitted to practice in

California since 1988 and the District of Columbia since 1990.  I have also

been admitted to the bars of the United States District Courts for the Eastern,

Central, Northern and Western District of California since 1989 and the

United States Court of Appeals for the Ninth Circuit since 1989.

2.      On or about August 26, 2005, each of the Petitioners served Respondents with

their Demand for Arbitration under the NFA Code of Arbitration and

Statement of Claim for Arbitration with supporting exhibits against

Respondents with the Arbitration Department of the National Futures

Association ("NFA"). A true and correct copy of the Statement of Claim is attached hereto as Exhibit **A.**

3.    On or about October 10, 2005, Respondents Linuxor Asset Management, LLC ("LAM"), Linuxor Capital Management, LLC ("LCM") and Abbas A. Shah ("Shah") filed Submission Agreements to the NFA in which each provided they submitted "the . . . matter in controversy as set forth in the Demand for Arbitration . . . in accordance with the Bylaws, Rules and Code of Arbitration of the National Futures Association." In addition, in their Submission Agreements to the NFA, Respondents agreed "to abide by and perform any awards(s) rendered pursuant to this arbitration proceeding . . . and voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment." A true and correct copy of the Respondents' Submission Agreements to the NFA are attached hereto as Exhibit **B.**

4.    On or about December 22, 2005, Respondents LAM, LCM and Shah filed a joint Motion to Dismiss and Answer with the NFA. A true and correct copy of the Respondents' Motion to Dismiss and Answer is attached hereto as Exhibit **C.**

5.    On or about May 3, 2006, the NFA appointed a three (3) member arbitration panel (the "Arbitration Panel") to conduct a hearing. A true and correct copy of a letter from NFA to all parties dated May 3, 2006 is attached hereto as Exhibit **D.**

6.      On or about August 14, 2006, the Arbitration Panel denied Respondents'

Motion to Dismiss. A true and correct copy of the Order of the NFA dated

August 14, 2006 is attached hereto as Exhibit **E.**

7.      After due notice of the appointment of said Arbitration Panel, and of the

hearing date(s), the hearings on the consolidated claims were held on

November 30, 2006, December 1, 2006, January 23, 2007 and January 24,

2007.

8.      Respondents LAM, LCM and Shah appeared through counsel and in person,

and had a full and fair opportunity to submit evidence and cross-examine

witnesses.

9.      The Arbitration Panel rendered its award after hearing testimony and

reviewing evidence presented by Petitioners in support of its claims against

Respondents and evidence presented by Respondents in defense of such

claims. Said awards were duly issued by the Arbitration Panel on March 5,

2007 (the "Awards"). The Arbitration Panel awarded Petitioner McCarthey

Investments, LLC compensatory damages and interest in the amount of

$4,054, 847, a separate award to Petitioner 2001 Jane F. McCarthey GRAT

No. 5 of compensatory damages and interest in the amount of $1,216,453 and

a third separate award to Petitioner JFM Holdings, L.P. of compensatory

damages and interest in the amount of $4,054,847. On or about March 15,

2007, the Awards were duly served by the NFA upon Respondents by sending

copies via two-day Federal Express, in envelopes to Respondents' attorneys.

True and correct copies of the Awards and certificate of service upon Respondents are attached hereto as Exhibit **F**.

10.   Pursuant to Section 10(g) of the NFA Code of Arbitration, Respondents were required to comply with the awards by making payment to Petitioners within thirty (30) days from transmittal of the Award by the NFA.  As of April 5, 2007 and through present, Respondents have failed to comply with the Award and have made no payment whatsoever to Petitioners.  True and correct copies of the Notices of Unpaid Awards are attached hereto as Exhibit **G**.

11.   Less than one (1) year has passed since the date of delivery of the Awards.

12.   At no time from March 15, 2007 through June 15, 2007 did Respondents provide any notice that they would assert any grounds to vacate, modify or correct the arbitration awards.  In fact, Respondents did not give notice of any arguments to support vacatur, modification or correction of the three arbitration awards until September 7, 2007, when Respondents filed papers in opposition to the petitions to confirm the arbitration awards.

13.   None of the Respondents is domiciled in either the state of Alaska or Utah. According to Shah's sworn deposition, the transcript of which was an exhibit in the NFA arbitration proceeding, there were two other members of LCM and LAM, Adam Bornstein and Tydus Richards.  Mr. Bornstein is not domiciled in either the state of Alaska or Utah.  Mr. Bornstein testified that he resided in New York until January 2003 whereupon he relocated to China where he currently lives and works.  Moreover, Mr. Bornstein's memberships in LCM and LAM were redeemed prior to the filing of the Petitions in this case.  A

true and correct copy of the Termination and General Release dated January 28, 2003 between Bornstein, Shah, LAM and LCM is attached hereto as Exhibit **H.** Tydus Richards, who lives and works in California, is also not domiciled in either the state of Alaska or Utah. A true and correct copy of a Form 8-K for PIVX Solutions, Inc. filed with SEC on April 3, 2005 is attached hereto as Exhibit **I.** According to Exhibit I, Mr. Richardst is the chairman of Lotus Funds, Inc., a Los Angeles California based venture capital fund. The Exhibit also states that Mr. Richards was a co-founder of the Linuxor fund. A true and correct copy of the WhitePages.com database as of September 25, 2007 showing that Tydus Richards of the Lotus Fund is located in Los Angeles, California is attached hereto as Exhibit **J.** A true and correct copy of the USSearch.com database as of October 1, 2007 showing Tydus Richards resides in Irvine, California, is attached hereto as Exhibit **K.**

14.    Respondents' Opposition Memorandum incorrectly alleges that Charles P. Nastro, chairman of the NFA arbitration panel, was biased because he is a former head of the NFA and failed to "question evidentiary documents submitted by the NFA." Opposition Memorandum p. 8. The NFA was not a party to the arbitration and did not submit any documents into evidence. At the hearing Petitioners offered various documents into evidence, including correspondence between the NFA Staff and Respondents and documents subpoenaed from the NFA in connection with the arbitration proceeding. With regard to each such document, Ick-soo Park, an NFA examiner, testified at the hearing under oath and authenticated each document. Respondents

were permitted to cross-examine Mr. Park, attempt to impeach his credibility, make objections to the admission of the documents into evidence and to submit evidence to contradict or at least bring into question the veracity of the exhibits.

15.    Respondents' Opposition Memorandum incorrectly alleges that arbitration panel member James Yellen and Petitioners' attorney, Anthony Djinis were school classmates and that they engaged in ex parte communications. The online directory of the Fordham University School of Law discloses that Mr. Yellen, Adjunct Professor of Law at Fordham, received a B.A. from St. Lawrence University in 1977; a Masters in Education from St. Lawrence University, in 1978; a license from the University of Navy, France in 1979 and a Juris Doctor degree from Fordham University School of Law in 1983. A true and correct copy of page reflecting Mr. Yellen's educational background from the Fordham University School of Law website is attached hereto as Exhibit **L**. My law partner, Mr. Djinis, has never attended any of these institutions. Mr. Djinis earned a Bachelor of Science in Physics from Rensselaer Polytechic Institute in 1971 and a Juris Doctor degree from St. John's University School of Law in 1974. The Panel, including Mr. Yellen, scrupulously observed a prohibition against ex parte communications with the parties and their counsel. I was present at the hearing and at no time did I observe Mr. Djinis and Mr. Yellen engage in any ex parte communications.

16.    The NFA's website, which was available to the public at the time of the arbitration proceeding, disclosed Mr. Maringer's disciplinary matter.

7

According to the NFA public disclosure, in 1986 Mr. Maringer, without admitting or denying the allegations of the CFTC, consented to an order that he failed to supervise. A true and correct copy the NFA Webpage disclosing Mr. Maringer's 1986 disciplinary matter is attached hereto as **Exhibit M**.

17.    On November 30, 2006 and December 1, 2006, the arbitration panel conducted 2 complete days of hearing during which it listened to witnesses and accepted documents into evidence.  Based upon the input of the parties, including Respondents, on December 5, 2006, the arbitration panel scheduled additional hearing dates for January 23, 2007 and January 24, 2007.  Over the next five weeks, Respondents made no request to postpone the hearing or advise the arbitration panel that the hearing dates might pose a problem.  Rather, on January 9, 2007, only two weeks before the resumption of the hearing, Respondents through their attorneys moved to adjourn the hearing until March or April 2007 in order to secure more funds to pay their attorneys.  The hearing panel denied this request and reconvened the hearing as scheduled on January 23, 2007.  True and correct copies of the NFA Scheduling Order dated December 5, 2006, Respondents' January 9, 2007 request for adjournment and the NFA Order dated January 16, 2007 are attached hereto as Exhibit **N, O and P**, respectively.

18.    The denial of the postponement by the hearing panel did not prejudice Respondents.  When the hearing reconvened on January 23, 2007, Respondents were represented by the same counsel that had represented them throughout the proceeding.  Respondents' counsel attended every day of the

hearing, cross-examined Petitioners' witnesses, presented evidence in defense, delivered a closing argument and prepared a post-hearing brief, all before the arbitration awards were rendered.

19. In their Opposition Memorandum, Respondents allege that an NFA supervisor, Cheryl Tulino, made insensitive inflammatory comments to Respondent Abbas Shah. See Opposition Memorandum p. 10. This allegation was never raised at any time during the arbitration proceeding. Ms. Tulino did not attend any hearing session. Ms. Tulino was not an arbitration panel member. She did not testify as a witness for any party, and did not appear as a representative of the NFA or in any other capacity.

20. The evidence in the record that Petitioners filed their Statements of Claim on August 26, 2005, and not on October 25, 2005 as Respondents assert, is unequivocal. By facsimile (and overnight delivery), Petitioners filed their Arbitration Claim Form, Statement of Claim, Certificate of Service and supporting exhibits with the NFA Arbitration Department on August 26, 2005. (NFA Case No. -05-ARB-107). That same day, a payment in the amount of $1550.00 was wired to the NFA's designated bank account to cover the filing fees. A true and correct copy of the cover letter dated August 26, 2007 from Anthony W. Djinis, Esq., senior partner of the law firm of Pickard and Djinis LLP to the NFA is attached hereto as Exhibit **Q.**

21. As documented at length in paragraphs 21 through 42 herein, the overwhelming evidence presented to the Arbitration Panel clearly supported the arbitration panel's awards against Respondents.

a. In connection with the McCarthey's Investors' investment, Shah falsely told Petitioners' investment manager, Phillip McCarthey that: he was managing a Fund called Linuxor Global for which he had lined up about $100 million in investments, that there were sophisticated overseas investors in the fund and that he had a successful strategy to limit the downside risk of loss. (See Phillip G. McCarthey Arbitration Testimony)

b. In connection with the McCarthey Investors' investment, Shah omitted to disclose to the McCarthey Investors that in early 2002, pursuant to a secret finders' agreement, Shah paid Tydus Richard a finders' fee in connection with the McCartheys' investment in the Linxuor Fund. (See Claimants Exhibit 50) The Confidential Offering Memorandum ("COM") for the Linuxor Fund failed to make required disclosure about the finder's fee paid by Shah to this unregistered third-party to recruit the McCarthey Investors. (See Claimants Exhibit 2)

Each of Shah's statements was materially false and misleading. Shah admitted that at the time he made these statements, the Fund had no investors, no money had been invested and the Fund had not even started trading. (See Abbas Shah Hearing Testimony.) Moreover, in his sworn deposition before the CFTC, **Shah** admitted that he never told Phil McCarthey that he was paying a finder's fee to Tydus Richards for "bringing McCarthey into the Linuxor Fund." (See Claimants Exhibit 53, p. 314)

22. Before the McCarthey Investors made their additional $10 million investment in the Linuxor Fund, Shah told McCarthey that the initial investment was "up

about 10%." (See Phillip G. McCarthey Arbitration Testimony.)  This statement was flatly false.  In fact, during the period March 19, 2002 through April 18, 2002, the Fund suffered losses of $119,245 - losing $7.95% of its value. (See Claimants' Summary Exhibit 2.)  McCarthey testified that Shah's false report to him in April 2002 that the Fund had made a 10% profit was a very important factor in his determination to invest another $10 million in the Fund.  (See Phillip G. McCarthey Arbitration Testimony.)

23.    Respondents failed to follow the Confidential Offering Memorandum ("COM") requirement that the Fund exit a trading strategy if the value of the Fund declined by more than 2%.  The COM stated (page 7) in pertinent part "The Fund will exit an investing or trading strategy if such strategy causes the Fund to depreciate by an amount equal to or greater than 2% of the aggregate value of the Fund's assets. (See Claimants' Exhibit 2, Confidential Offering Memorandum, p. 7.)"  The undisputed evidence in the record is that Shah repeatedly and materially violated this trading restriction.  From October 2001 through January 31, 2003, Adam Bornstein worked at Respondent LAM for Respondent Abbas Shah, and was the only person working for Shah at such time.  Bornstein testified that Shah did not follow this stated investment policy.  (See Adam Bornstein Arbitration Testimony).

24.    Respondents also failed to follow the COM requirement that the Fund cease trading for the remainder of any month in which the value of the Fund declined by more than 10%. The COM states in pertinent part "The Fund will also cease trading for the remainder of any month in which trading reversals

cause the Fund's aggregate value to depreciate by an amount greater than 10%
of the aggregate value of the Fund as of the beginning of that month." See
Claimants' Exhibit 2, Confidential Offering Memorandum, p. 7. Bornstein
testified that Respondents failed to abide by this trading restriction as well.
Jeffrey Rosen, a securities and commodities law expert, conducted an analysis
of the Respondents' conduct of the fund and testified that in June 2002, the
Fund depreciated 14.35%, yet Respondents continued to trade in violation of
policy; in August 2002, the Fund depreciated 32.95%, yet Respondents
continued to trade in violation of policy; in December 2002, the Fund
depreciated 16.36%, yet Respondents continued to trade in violation of policy;
in February 2003, the Fund depreciated 15.54%, yet Respondents continued to
trade in violation of policy; in March 2003, the Fund depreciated 18.84%, yet
Respondents continued to trade in violation of policy; In May 2003, the Fund
depreciated 39.09%, yet Respondents continued to trade in violation of policy;
in February 2004, the Fund depreciated 26.88%, yet Respondents continued to
trade in violation of policy; and In March 2004, the Fund depreciated 33.20%,
yet Respondents continued to trade in violation of policy. (See Jeffrey S.
Rosen, Esq. Arbitration Testimony; See Summary Exhibit 9).

25.    Shah also failed to follow the COM requirement that the Fund cease trading in
the event the margin requirement for the Fund's commodities account
exceeded 25%. From March 2002 to January 2003, Shah repeatedly and
materially violated the margin limit restriction. The COM states in pertinent
part, "Commodity interest positions will not generally be initiated (or

increased) where the aggregate size of the position requires margin amounts greater than 25% of the Fund's assets allocated to the account." (See Claimants' Exhibit 2, Confidential Offering Memorandum, p. 7.) In August 2002, the Fund's prime broker, ABN AMRO, warned Shah that he had "repeatedly and materially exceeded the [margin] limit." (See Claimants' Exhibit 11.) Bornstein testified that Respondents failed to abide by this trading restriction as well. Indeed, Bornstein testified that Shah knew that he had repeatedly and materially exceeded the margin limit and nonetheless continued to exceed the margin limit. (See Adam Bornstein Arbitration Testimony.) Respondents' violations of this investment policy through at least January 2003 were established through Jeffrey Rosen's expert analysis. In this regard, Mr. Rosen demonstrated to the arbitration panel that in May 2002, the Initial margin of Fund's commodities account was 62.55% and Respondents continued to initiate or increase commodity interest positions throughout June 2002; in June 2002: Initial margin of Fund's commodities account was 59.45% and Respondents continued to initiate or increase commodity interest positions throughout July 2002; in July 2002 the Initial margin of Fund's commodities account was 46.78% and Respondents continued to initiate or increase commodity interest positions throughout August 2002; in December 2002: Initial margin of Fund's commodities account was 50.38% and Respondents continued to initiate or increase commodity interest positions throughout January 2003. (See Claimants' Summary Exhibit 10.)

26.    In November 2002, ABN AMRO told Shah it would not provide prime

brokerage services for him or his accounts and "would accept only liquidating

(closing) transactions." (See Claimants' Exhibit 13.) Nevertheless,

Respondents not only failed to comply with the investment policy set forth in

the COM, they concealed this fact from Petitioners.  (See Abbas A. Shah

Arbitration Testimony.)  Undeterred, Shah closed the ABN AMRO account,

liquidated certain of the positions and transferred the balance to Man

Financial, where he promptly resumed his material violation of the COM

investment policy. See Claimants' Summary Exhibit 10.  These were not mere

technical violations: the Fund lost over $6 million as a result of Shah's failure

to abide by the COM's investment restrictions. (See Respondents' Revised

Exhibit A-1.)

27.    Respondents also failed to follow the COM requirement that the Fund retain

an "independent representative" to verify that any Funds withdrawn from the

Fund were proper. Claimants Exhibit 2, Confidential Offering Memorandum,

p. 32., states in pertinent part: [a]s a safekeeping measure, the Fund has agreed

with its Prime Broker on specific procedures the General Partner and/or the

Investment Manager must follow in order to withdraw capital from the Fund,

or be reimbursed for expenses they have paid on behalf of the Fund.  Under

that agreement, the Prime Broker may not transfer any Fund assets to the

General Partner or the Investment Manager or to their affiliates for any reason

until the Fund's "independent representative" has provided a letter directly to

the Prime Broker confirming that it has performed certain procedures to verify

that the calculation of any amounts to be paid to the General Partner or the
Investment Manager confirm to the Partnership Agreement and the
Investment Management Agreement, respectively, and is mathematically
accurate, and for proposing withdrawals of capital, that the amount to be
withdrawn is less than the withdrawing Partner's Capital Account balance.
Phil McCarthey testified that this safeguarding measure had an important role
in his decision to invest in the Linuxor Fund.  (See Philip G. McCarthey
Arbitration Testimony).  This was also not a mere technical violation.  The
evidence presented to the Arbitration Panel shows that without this important
oversight mechanism, Shah extracted over $100,000 of management fees in
excess of what he was permitted; furthermore, Shah misappropriated Fund
assets belonging to the McCarthey Investors for various improper related
party and self-dealing transactions.

28.    From April 2002 through September 2004, after the Fund had closed down,
the Respondents did not send any quarterly, annual or other reports
concerning the performance or financial condition of the Fund to the
McCarthey Investors.  (See Claimants' Exhibits 45, 47 and 48.)   Instead of
preparing or distributing annual or quarterly financial reports to the
McCarthey Investors (or filing any such documents with the NFA as required
by law), Respondents instead repeatedly and materially lied to the McCarthey
Investors about the performance of the Fund and the value of their
investments in the Fund.

29.    In a telephone conversation with Phil McCarthey and Todd Brashear and in an

e-mail dated August 25, 2003, Shah represented to McCarthey that from

January 1, 2003 to August 25, 2003, the Fund earned over $2.49 million.  (See

Claimants' Exhibit 20; Todd Brashear Arbitration Testimony, Phillip G.

McCarthey Arbitration Testimony.)  In fact, Shah's August 25, 2003 e-mail to

Brashear and Shah's verbal representation to McCarthey and Brashear were

false in that from January 1, 2003 to August 25, 2003 the Fund lost

$2,080,985. (See Summary Exhibit 3.)

30.    Shah sent to the McCarthey Investors' CFO, Todd Brashear, an e-mail dated

January 30, 2004 which stated: Your account balance as of 12/30/03 was

approximately: $8,095,000, Realized:$6,500,000 and Unrealized: $1,595,000.

(See Claimants' Exhibit 29.)  Shah's January 30, 2004 e-mail to Brashear was

a materially false and misleading statement about the value of the McCarthey

Investors' investment in the Linuxor Fund.    Contrary to Shah's

representation that the value of the McCarthey Investors' investment in the

Fund on December 30, 2003 was over $8 million, in fact the evidence

presented to the Arbitration Panel was that the actual value of the McCarthey

Investors' investment in the Fund on December 30, 2003 was $3,764,163, less

than half Shah's claim. (See Claimants' Summary Exhibit 4.)  On cross-

examination, Shah admitted that his January 30, 2004 e-mail to Brashear was

false and that he made a "big mistake." Indeed, in response to the Panel's

questions to Shah about the basis upon which he calculated that the

McCarthey Investors' account balance as of December 31, 2003 was

$8,095,000, Shah admitted that he wrote the e-mail without any documents at his disposal and could not even explain how he arrived at the $8 million figure. (See Todd Brashear Arbitration Testimony.)  In his sworn deposition in the civil action brought against him by the CFTC, Shah stated that a few months after that e-mail, when the NFA began its audit of Linuxor, he "recalculated" the actual net asset value of the fund on December 30, 2003 and determined that the e-mail to Brashear about the value of their account balance on that date "was about I think 4 odd million dollars" less than he represented.  (See Claimants' Exhibit 53, pp. 397-398.)  McCarthey and Brashear each testified that Shah never advised them that the January 30, 2004 e-mail was incorrect in any respect, and in Shah's deposition Shah admitted he never sent a subsequent e-mail, letter or any document correcting his gross overstatement to the McCarthey Investors.  (See Todd Brashear Arbitration Testimony, Phillip G. McCarthey Arbitration Testimony; Claimants' Exhibit 53, pp. 384-385, 399.)

31.     During the period from August 29, 2003 through May 31, 2004, Shah sent weekly e-mails to the Petitioners about the performance of the Fund.  (See Claimants' Exhibit 22.)  Shah's e-mails to the Petitioners during this period were materially false and misleading.  For example, Shah represented to the Petitioners that for the month of February 2004 the Fund earned a profit of $47,500, whereas in truth for that month the Fund's actual performance was a loss of $1,119,579.  (See Claimants' Summary Exhibit 5.)

32.     After making materially false written reports of the Fund's positive

performance in February 2004 (rather than disclosing that the Fund actually

lost over $1 million in that month), Shah continued to craft and send

materially false e-mails to the McCarthey Investors over the next five weeks

as the true value of the Fund continued to sharply decline.  According to

Shah's weekly e-mails to the McCarthey Investors about the profit or loss of

the Fund during the period from March 1, 2004 to April 2, 2004, the Fund's

performance was essentially flat (losing $3000 over the 5 week period).  (See

Claimants' Exhibit 22.)  The actual value of the Fund, as reflected in the

Fund's bank and brokerage statements for that same period, decreased by

$282,464 over that time period.  (See Claimants' Summary Exhibit 7.)

33.     In April 2004, Shah boasted to Todd Brashear that he was doing "gangbuster

business" in the Fund during the first three months of the year, "beating all

performance records." (See Todd Brashear Arbitration Testimony.)  When

Brashear asked Shah about the value of the McCarthey Investors' investment

in the Fund, Shah informed Brashear that the value of the investment was

approximately $8.2 million.  In response, Brashear told Shah that this figure

seemed too low.  Shah replied that he must have made a mistake and that he'd

"check his numbers and call back."  Shah later called back and revised the

stated value of the investment to $9 million.  (See Todd Brashear Arbitration

Testimony.)  In mid-May 2004, Shah advised Phil McCarthey that the value

of the McCarthey Investors' investment in the Fund was $9.0 to $9.5 million.

(See Claimants' Exhibit 43, Phillip G. McCarthey Arbitration Testimony.)  In

truth, as Shah has since admitted, the value of the McCarthey Investors'
investment in the Fund was approximately $5.4 million. See Claimants'
Exhibits 1.27 and 53, p. 409. On June 3, 2004, Shah told Todd Brashear that
the value of the McCarthey Investors' investment in the Fund was
approximately $9.0 million. See Claimants' Exhibit 38, Todd Brashear
Arbitration Testimony. In actuality, as proven through the Fund's bank and
brokerage statements for June 3, 2004, the value of the McCarthey Investors
investment in the Fund was only $4,923,874. (See Claimants' Exhibit 1.28.)

34.    During the first quarter of 2003, the Fund's independent auditor discovered
Shah's material overcharge of management fees and instructed him to take
corrective action. (See John Zacharella Arbitration Testimony) The evidence
presented to the arbitration panel demonstrated that not only did Shah fail to
inform investors that he had overcharged them, Shah thumbed his nose at the
instructions of the Independent Auditor and continued to take management
fees to which he was not entitled in 2003 and 2004.

35.    The Fund's Investment Management Agreement ("IM Agreement") states in
pertinent part: "[the] Fund will pay the Investment Manager a monthly fee . . .
payable in arrears, and calculated at an annual rate of 2% of the Net Asset
Value of the Fund." (See Claimants' Exhibit 2.) John Zacharella, the
independent auditor of Linuxor's financial statements for the year ending
December 31, 2002, testified that: he reviewed the IM agreement to see how
the management fee was supposed to be calculated; he noted that the IM
Agreement stated that "the Fund will pay the Investment Manager a monthly

management fee payable in arrears, and calculated at an annual rate of 2.0%

of the Net Asset value of the Fund." Zacharella testified he then reviewed the

Fund's books and records to determine the amount of management fees that

the Fund actually paid during that period and prepared a work paper to reflect

his review of the management fees charged to the Linuxor Fund.  Zacharella

testified that he He found that in 2002, $214,200 was paid by the Linuxor

Fund in management fees to LAM and that the amount of management fees

that should have been charged to the Fund in 2002 was only $103,071. (See

John Zacharella Arbitration Testimony; See Claimants' Exhibit 16.) Thus,

Zacharella concluded, Shah materially overcharged management fees in 2002

in the amount of $111,129. (See John Zacharella Arbitration Testimony.)

36.     Zacharella testified he then had a conversation with Shah in the first quarter of

2003 in which he told Shah that Shah had overcharged $111,129 of

management fees to the Fund.  Shah did not, as he should have, cause LAM to

repay the $111,129 owed to the Fund.  Instead, Shah agreed with Zacharella's

instruction not to take any more management fees from the Fund until it had

earned an amount equal to the overcharge. (See John Zacharella Arbitration

Testimony.)  However, Shah immediately breached his promise and continued

to extract monies from the Fund in the amount of approximately $125,000,

purportedly for management fees.  Indeed, to underscore that Shah never

intended to follow Zacharella's instruction, within weeks of promising to

Zacharella not to take any more management fees from the Fund:   On April 2,

2003: Shah withdrew $13,180.53 in cash from the Fund's securities account

and deposited it into the Fund's advisers' bank account. (See Claimants'

Exhibit 1.14, pp. NFA01585 and JPM 00032.) On May 12, 2003: Shah

withdrew $10,000 in cash from the Fund's securities account and deposited it

into the Fund's advisers' bank account. (See Claimants' Exhibit 1.15, pp.

MPS 00068 and NFA01789.) These withdrawals are also reflected in an

analysis of the Linuxor Fund's account at Wexford Global, which was

provided to the Panel under cover of letter dated January 12, 2007.

37.   The evidence in the record is that from September 1, 2003 to September 2,

2004 the Respondents caused the Fund to make unauthorized disbursements

of approximately $102,000. (See Claimants' Summary Exhibit 11; Jeffery

Rosen Arbitration Testimony.)  Phil McCarthey testified that he read the

management fee provision in the COM before making his investment in the

Fund and that he understood that the Fund would be paying investment

management fees to Shah at a rate of 2% per annum based upon the NAV of

the Fund. Nevertheless, Shah never issued any reports about the amount of

management fees that he had taken from the Fund, never gave the McCarthey

Investors an oral report about the amount of management fees that he had

taken from the Fund and at no time did Shah ever advise him that he had taken

over $100,000 from the Fund that he was not entitled to take. (See Phillip G.

McCarthey Arbitration Testimony.)

38.   In April 2004, the two other investors in the Fund, Phil Egger and James

Temple demanded their money back from Shah.  Like other Ponzi schemes,

the first investors to get out were paid with the remaining investor's money.

In this case, Shah overpaid Egger and Temple nearly $1.3 million of the McCarthey Investors' money. (See Claimants' Summary Exhibits 12 and 13)

39.     In mid-May 2004, Shah promised the NFA that he would immediately commence an orderly liquidation of the Fund. As Shah testified before the CFTC, "I think May 17 or May 18 when the NFA were aggressively pursuing us liquidating the funds, and at the time I believe [the Fund's NAV] was about $5.3 million, NAV." (See Claimants' Exhibit 53, p. 409.) In his July 21, 2006 affidavit that he filed with the Panel, Shah repeated that "the NFA inquiries initiated the orderly liquidation of the accounts, on or around May 17, 2004." (See Claimants' Exhibit 27, July 21, 2006 Affidavit of Abbas A. Shah, ¶18.) It is undisputed that on or about May 17, 2004, the value of the Linuxor Fund was approximately $5.38 million and that the McCarthey Investors were the sole investors in the Fund. (See Claimants' Summary Exhibit 15; Claimants' Exhibit 27, July 21, 2006 Shah Affidavit, ¶¶18 and 19.) As the overwhelming evidence in the case presented to the Arbitration Panel clearly established, Shah did **not** commence an orderly liquidation of the Fund in mid-May 2004 and thereby caused the McCarthey Investors to incur an additional $1.38 million in losses. (See Claimants' Summary Exhibit 15.)

40.     As if his egregious, repeated and material lies to and frauds upon the McCarthey Investors during the operation of the Linuxor Fund were not enough, Shah continued to defraud the McCarthey Investors even after the Fund was closed. Indeed, despite his assurance to the NFA that he fully

redeemed the McCarthey Investors' investments by paying the McCarthey

Investors a total of $4,002,899, in reality Shah retained approximately

$80,000, at least $37,000 of which was misappropriated. (See Claimants'

Summary Exhibit 16; Jeffrey Rosen Arbitration Testimony.) For example on

June 29, 2004, Shah paid $7,500 to the Cayman Island attorneys to Shah's

offshore hedge fund. (See Claimants' Exhibit 2, p.8 of Offshore COM.)

There is absolutely no evidence that this law firm performed any service to the

Linuxor Fund; from June 3 through July 31, 2004, Shah paid approximately

$3000 in restaurant, limo and liquor bills; on December 20, 2004, Shah paid

$11,500 in an attempt to bail out his failing private software company,

Isospace; and on January 24, 2005, Shah paid another $10,500 to Isospace.

41.    Indeed, on March 23, 2006, almost two years after the Fund ceased

operations, there was still $5225 in the Fund's bank account that had not yet

been returned to the McCarthey Investors. (See Claimants' Exhibit 54.) Shah

admitted that the decision to keep this portion of the money due the

McCarthey Investors was his and his alone. (See Claimants' Exhibit 53, pp.

512-515.)

42.    To address Respondents' specific allegation that Petitioners knew or should

have known of Respondents' wrongful actions giving rise to claims against

them on August 25, 2003, Petitioners presented evidence to the arbitration

panel that:

- From May 2002 through late August 2003, the Respondents did not send any
  quarterly annual or other reports concerning the performance or financial
  condition of the Fund to the Petitioners. Additionally, during that time neither
  Shah nor anyone else acting on behalf of the Respondents ever advise the

Petitioners that they had suffered any material losses in connection with their investments in the Fund. <u>See</u> Affidavit of Todd Brashear, ¶2.

- In late August 2003, Shah called Brashear to inform him that the Petitioners would be receiving the 2002 Schedule K-1s covering the Fund's performance through the end of December 2002, which would indicate a loss for 2002. Shah falsely represented that the loss was not greater than the downside risk parameters to which he had previously agreed to abide. Further, Shah falsely advised that since the end of 2002, the fund had recouped much of the Petitioners' losses. <u>See</u> Affidavit of Todd Brashear.

- In an e-mail dated August 25, 2003, Shah advised Brashear that although the K-1 would reflect a loss in the value of the investments as of December 31, 2002, Shah assured Brashear that the December 31, 2002 snapshot of the investment's performance was misleading and should not be cause for concern. <u>See</u> Affidavit of Todd Brashear.

- Despite Shah's promises to Brashear that Shah would provide him with the 2002 Schedule K-1s for the Fund, Shah did not provide these documents to Petitioners at any time. <u>See</u> Affidavit of Todd Brashear.

- Sometime after August 27, 2003, the Fund from the Fund's certified public accountants, Rothstein, Kass & Company, P.C. mailed the 2002 Schedule K-1s for the Fund to Petitioners along with a cover letter dated August 27, 2003. The Schedule K-1s contain a date and time of preparation of 6:20:55pm on August 27, 2003. <u>See</u> Affidavit of Todd Brashear; Affidavit of John Zacharella.

In its August 14, 2006 order denying Respondents' motion to dismiss on statute of limitations grounds, the arbitration panel noted that it had conducted a preliminary hearing to decide Respondents' contentions and had reviewed and considered all written submissions relating to the matter. <u>See</u> Arbitration Panel's August 14, 2006 Order.

43.     As was also set forth in Mr. Djinis' affidavit submitted to the arbitration panel in opposition to Respondents' Motion to Dismiss, on August 25, 2005 Mr. Djinis telephoned the NFA Arbitration Department during which call he provided to the department oral notice that the three Petitioners intended to file a Statement of Claim and arbitrate a claim before the NFA against the Respondents. Mr. Djinis specifically made this call to preserve

Petitioners' right to file a statement of claim with the NFA.    (See Affidavit of Anthony W. Djinis, Esq. dated March 20, 2006)

I hereby certify that the statements contained herein to the best of my knowledge and belief are true and correct.

Dated: October 1, 2007                    _____

Paul J. Bazil, Esq.